UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLANCA NELLY AVALOS, et al.,

        Plaintiffs,

v.

CINTAS CORPORATION,

        Defendant.
_____/

Case No. 06-12311

HONORABLE SEAN F. COX
United States District Judge

## OPINION & ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF TANESHA DAVIS [Doc. No. 533]

Plaintiff Tanesha Davis ("Davis") filed her Sixth Amended Complaint [Doc. No. 331] in this action against Defendant Cintas Corporation ("Cintas") on September 2, 2008. The matter is currently before the Court on Cintas' motion for summary judgment against Ms. Davis [Doc. No. 533]. The parties have fully briefed the issues, and the Court declines to hear oral argument pursuant to E.D. MICH. L.R. 7.1(f)(2). For the reasons that follow, the Court **GRANTS** Cintas' motion for summary judgment [Doc. No. 533], and **DISMISSES** Ms. Davis' case in its entirety.

### BACKGROUND

Ms. Davis twice unsuccessfully applied for a Service Sales Representative ("SSR") position at Cintas' Franklin, Wisconsin facility ("Location 447"), in September 2003 and September 2004. [Pl.'s Complaint, Doc. No. 331, ¶14]. At the time of her applications, Ms. Davis had no prior route sales or route customer service experience - rather, her entire sales and customer service background was retail focused. [Davis Dep., pp.31-41, 55-57, 92-94, 96, 103-05, 136]. Ms. Davis also admitted that no one at Cintas ever said anything that suggested to her

1

that her gender was a factor in any decision Cintas made about her:

> Q: Did anyone at Cintas ever make any statement that you thought indicated that your gender was a factor in any employment decision that Cintas made regarding you?
> A: No.

*Id*. at 123.

### Location 447's SSR Hiring Process and Criteria.

In both 2003 and 2004 - and still currently - Location 447 employed SSRs. [Lombardo Decl., ¶5]. SSRs generate new sales and "upsell" services and products to customers while driving their assigned routes. *Id*. SSR positions are physically demanding, with SSRs constantly lifting and carrying uniforms and supplies that they deliver and pick up daily. *Id*.

From mid-2003 to early 2005, Location 447 used a multi-step process to screen candidates for SSR job openings. *Id*. at ¶6. First, personnel reviewed applications and selected candidates for an initial screening interview - most of which were conducted by Location 447's Human Resource Manager, Christine Richards ("Richards"). [Richards Decl., ¶¶4, 5]. In the initial screening interview, Ms. Richards would ask standardized questions from Location 447's "Rental SSR Screening Interview Guide." *Id*. at ¶¶11-13. Ms. Richards would then decide whether to immediately reject an applicant or move them on to written testing and an in-depth interview with a Location 447 manager, typically a Service Manager or the General Manager, who during the relevant time period was Pete Lombardo. [Lombardo Decl., ¶¶3, 6].

Successful applicants would then have additional interviews with location managers, and a "route ride" job tryout with an experienced SSR. *Id*. at ¶6(c), (d). One purpose of the route ride was to give the candidate an opportunity to experience what an SSR job was actually like so that they could gauge their continued interest in becoming an SSR. Another purpose was to give

2

the candidate an opportunity to demonstrate energy, efficiency, customer orientation, attention to detail, work ethic, and initiative while actually performing job duties. *Id*. at ¶14. Location 447 required the individual conducting the candidate's route ride to promptly prepare an evaluation form, honestly and accurately setting forth his or her assessment of the candidate's performance on the route ride. [Pressendorfer Decl., ¶7].

After the route ride and interview phases, the managers involved in the candidate's screening process met with the General Manager - Mr. Lombardo - to exchange information. At this "information exchange" meeting, managers collectively reviewed and discussed the candidate's qualifications and performance during the entire hiring process. [Lombardo Decl., ¶6(f)]. Often times the individual who conducted the route ride would be present at this meeting, though at the very least their observations and assessments were made known to Mr. Lombardo and to the other individuals at the meeting. *Id*. When concerns about a candidate were raised at the "information exchange" meeting, Mr. Lombardo's regular practice was to ensure that he and the managers talked through things sufficiently so that each candidate was given fair consideration. *Id*.

Location 447 required successful SSR applicants to have customer service and sales orientation - leading to the logical preference for applicants with prior customer service and sales experience. *Id*. at ¶7. While Location 447 did not specifically require candidates to have prior route sales or route customer service experience, hiring managers gave favorable consideration to such experience if it was similar to SSR job duties. *Id*., see also Richards Decl., ¶19.

At all times relevant to this cause of action, Cintas had in effect a company-wide policy prohibiting unlawful discrimination on the basis of gender in hiring and other employment-

3

related actions. [Richards Decl., ¶6].

      <u>Ms. Davis' 2003 Application with Cintas</u>.

      Ms. Davis first applied as an SSR with Location 447 on September 23, 2003, while she was working as a manager at LensCrafters - a retail store that sells eyeglasses. [Davis Dep., pp.13-15]. Ms. Richards conducted an initial screening interview with Ms. Davis on October 15, 2003. [Richards Decl., ¶¶6-13]. At the interview, Ms. Davis used Cintas' screening interview guide to ask Ms. Davis Cintas' standardized hiring questions, and Ms. Davis did not feel anything said or done by Ms. Richards during the October 15, 2003 interview was inappropriate. [Davis Dep., pp.61-64].

      During her interview, Ms. Davis commented that she disliked her current position with LensCrafters due to her having to "upsell" what she considered to be overpriced merchandise. *Id*. at 98. Ms. Davis also indicated to Ms. Richards that she desired to remain employed with LensCrafters on a part-time basis, *Id*. at 94, and that she had recently also applied with two other optical companies for positions similar to her current one with LensCrafters.[1] *Id*. at 99.

      Ultimately, Ms. Richards did not advance Ms. Davis beyond the initial screening interview phase of the hiring process with Location 447. [Richards Decl., ¶14]. Ms. Richards wrote "Not Best Qualified" on her applicant flow log as the reason for rejecting Ms. Davis' application. *Id*. at ¶¶6-9. Ms. Davis' gender was not a factor, in whole or in part, in Ms. Richards' decision not to advance Ms. Davis. *Id.* at ¶15.

---

[1] In fact, Ms. Davis testified at her deposition that she had already accepted a full-time position with PearleVision - to start on October 23, 2003, only one week after Ms. Davis' initial screening interview with Cintas. [Davis Dep., p.90]. Despite having accepted the position with PearleVision - which paid $3,500.00 per year more than the entry-level SSR position with Cintas - Ms. Davis neglected to mention the new PearleVision position during her October 15, 2003 interview with Ms. Richards.

4

In June of 2003, shortly before Ms. Davis had applied with Cintas, Location 447 hired another female applicant for an SSR position. [Lombardo Decl., ¶19]. Further, between the date Ms. Davis applied with Location 447 and when her application was eventually denied, Cintas hired two applicants for SSR positions: Ross Wenthur and Tim Koelbl. *Id*. at ¶21. Both Mr. Wenthur and Mr. Koelbl were given an initial screening interview with Ms. Richards, at which time Ms. Richards asked the same interview questions as were posed to Ms. Davis. [Richards Decl., ¶¶17-18]. Unlike Ms. Davis, however, both Mr. Wenthur and Mr. Koelbl had prior route sales and route customer service experience. [Lombardo Decl., ¶21]. As with Ms. Davis' application, both Ms. Richards and Mr. Lombardo denied that gender was a factor in Location 447's decision to hire either Mr. Wenthur or Mr. Koelbl. [Lombardo Decl., ¶4, Richards Decl., ¶¶21-22]. Rather, Mr. Wenthur and Mr. Koelbl - due in part to their prior route experiences - were simply deemed better qualified candidates for the SSR position than was Ms. Davis. [Richards Decl., ¶19].

Ms. Davis' 2004 Application with Cintas.

Ms. Davis re-applied for an SSR position at Location 447 on September 22, 2004. [Davis Dep., pp.103-105]. This time, Ms. Davis testified that she did "more reasearch" before her 2004 interview, and that she "felt that [she] was more prepared" than in the 2003 interview. *Id*. at 66. This time, Mr. Lombardo conducted Ms. Davis' initial screening interview - held on September 23, 2004. [Lombardo Decl., ¶8]. Notably, *Mr. Lombardo advanced Ms. Davis' application to the next step in the hiring process*. *Id*. at ¶11. Ms. Davis then successfully completed the required written test, underwent additional interviews, and was ultimately invited to participate in a route ride. [Davis Dep., pp.70-72; Lombardo Decl., ¶12].

5

On October 11, 2004, Ms. Davis went on a route ride with Matthew Presendofer, a Location 447 employee experienced in running routes, performing SSR job functions, and training newly-hired SSRs. [Presendofer Decl., ¶¶3-8]. On her route ride, Ms. Davis assisted in delivering floor mats and supplies to clients, and performed other SSR route responsibilities. [Davis Dep., p.77].

After Ms. Davis' route ride, Mr. Presendofer wrote a route ride evaluation and shared his assessment of Davis' performance with Location 447 managers at Ms. Davis' "information exchange" meeting. [Presendofer Decl., ¶¶7-8]. In both his written assessment and at the information exchange, Mr. Lombardo testified that Presendofer reported some positive feedback about Ms. Davis. "I remember [Presendofer] saying that he liked Tanesha, she did a lot of things well on the route in their day together." [Lombardo Dep., p.172]. Mr. Presendofer expressed concern, however, regarding Ms. Davis' level of physical energy and efficiency that she demonstrated on the route ride, prompting Mr. Presendofer to question whether Ms. Davis could handle the daily grind of an SSR position. [Presendofer Dep., pp.68-70].

After these concerns were aired and discussed, Mr. Lombardo determined that Ms. Davis was not the best qualified candidate for any available SSR position at Location 447. [Lombardo Decl., ¶¶14-15]. Again, as with her application in 2003, Ms. Davis' gender was not a factor, in whole or in part, in Location 447's decision not to hire Ms. Davis. *Id*. at ¶16.

Another female - Fawn Pomeroy - applied for an SSR position in September of 2004. *Id*. at ¶17. Both Ms. Richards and Mr. Lombardo each interviewed Ms. Pomeroy, and Ms. Pomeroy successfully completed a route ride on September 30, 2004. *Id*. at ¶18. On October 19, 2004 - only eight days after Ms. Davis' route ride, Mr. Lombardo deemed Ms. Pomeroy to be the best

6

qualified candidate for the SSR position, and approved Ms. Pomeroy's hiring. *Id.* at ¶¶18.

Other female SSR applicants at Location 447 also did well and advanced in the hiring process. In January of 2005, Mr. Presendofer conducted a route ride with Katherine Varga, and Mr. Presendofer gave her a glowing recommendation. [Presendofer Decl., ¶11(c)]. Ultimately, however, Ms. Varga withdrew her application with Location 447 before a hiring decision could be made. Further, in March of 2005 - only a few months after Ms. Davis' application - Location 447 hired Ms. Sherwannia Gatewood as an SSR. Like Ms. Davis, both Mr. Lombardo and Ms. Richards interviewed Ms. Gatewood. [Lombardo Decl., ¶30; Richards Decl., ¶20].

The Instant Motion.

Cintas filed its motion for summary judgment [Doc. No. 533] on December 14, 2009, advancing three primary arguments: 1) that Davis did not timely file charges with the EEOC on either her 2003 or her 2004 claims [*See* Def.'s Br., Doc. No. 533, p.11]; 2) that Davis cannot show pretext sufficient to sustain her disparate treatment claims [*See* Doc. No. 533, p.12]; and 3) that Davis' disparate impact claims fail as a matter of law. [*See* Doc. No. 533, p.16]. Ms. Davis opposes Cintas' motion. [*See* Pl.'s Br., Doc. No. 577].[2]

STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[2] On March 22, 2010 - *nineteen* days after Cintas filed its reply brief [Doc. No. 587], and only three days before the Court was originally scheduled to hear oral argument on this motion, Ms. Davis filed her "Motion to Strike" [Doc. No. 612], seeking to strike Cintas' "Reply Facts" [Doc. No. 590]. The next day - March 23, 2010 - the Court cancelled oral argument on Cintas' underlying motion for summary judgment [*See* Doc. No. 615]. As the Court has not relied upon anything contained within Cintas' "Reply Facts" [Doc. No. 590], the Court **DENIES AS MOOT** Ms. Davis' motion to strike [Doc. No. 612].

7

matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

ANALYSIS

Ms. Davis argues that Cintas discriminated against her in both her 2003 and 2004 applications with Location 447. Cintas argues that Ms. Davis' cannot show that Location 447's decisions not to hire her in either 2003 or 2004 were a pretext for gender discrimination - rendering summary judgment on behalf of Cintas proper for Ms. Davis' disparate treatment claims. Cintas also argues that Ms. Davis' disparate impact claims fail as a matter of law.[3] The Court agrees with both of these arguments by Cintas, and therefore **GRANTS** Cintas' motion for summary judgment [Doc. No. 533].

I. Davis' Disparate Treatment Claims.

Ms. Davis argues that Cintas discriminated against her in its hiring process due to her gender. Like all Title VII claims where there is no direct evidence of discrimination, Ms. Davis'

---

[3] Cintas also advances a third argument in its motion for summary judgment: that Ms. Davis' claims were procedurally defaulted due to her failure to file a timely discrimination charge with the EEOC. [*See* Def.'s Br., Doc. No. 533, pp.11-12]. Ms. Davis, however, argues that her failure to file an EEOC charge is excused under the "single filing rule" announced in *Howlett v. Holiday Inns, Inc.*, 49 F.3d 189 (6th Cir. 1995). [*See* Pl.'s Br., Doc. No. 577, pp.18-20]. As Ms. Davis' claims ultimately still fail on the merits, the Court declines to reach this issue, and assumes only for purposes of this opinion that Ms. Davis' claims were not procedurally defaulted.

8

claims are analyzed under the burden-shifting framework established by the Supreme Court in *McDonald-Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). The burden is first on Ms. Davis to demonstrate a prima facie case of race discrimination - conceded by Cintas for purposes of this motion. [*See* Def.'s Br., Doc. No. 533, p.12]. The burden then shifts to Cintas to offer a legitimate, nondiscriminatory explanation for its actions. *McDonald-Douglas*, 411 U.S. at 802-04. Here, Cintas has argued - undisputed by Ms. Davis for purposes of *McDonald-Douglas*'s second prong - that Ms. Davis was simply "not the best qualified" candidate. [*See* Def.'s. Br., Doc. No. 533, p.13]. Thus, under *McDonnell-Douglas*, "the burden shifts back to [Ms. Davis] to show pretext - i.e., that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chemical Corp.*, 580 F.3d 394, 400 (6th Cir. 2009), citing *McDonnell-Douglas*, 411 U.S. at 802-04.

In the instant motion, the parties dispute only the issue of pretext. The Sixth Circuit has held that pretext can be shown:

> . . . in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action.

*Chen*, 580 F.3d at 400, citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004).[4] To carry her burden in opposing summary judgment, Ms. Davis must produce sufficient

---

[4] Relying upon *Chen*, Ms. Davis argues that the proper standard for showing pretext should be whether "no reasonable juror could doubt [Cintas'] proffered explanations." [Pl.'s Br., Doc. No. 577, p.6]. In so arguing, Ms. Davis relies solely upon a footnote in *Chen*, which noted that the Supreme Court had previously held that "summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." *Chen*, 580 F.3d at 400 n.4, citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000). Notwithstanding footnote four, the Sixth Circuit in *Chen* nonetheless analyzed the plaintiff's claims under the three-pronged inquiry cited above. *See Chen*, 580 F.3d at 400-02. To the extent Ms. Davis argues that another standard should be used to analyze pretext within the traditional *McDonnell-Douglas* inquiry, the Court finds that Ms. Davis' arguments lack merit.

evidence from which a jury could reasonably reject Cintas' explanation of why it choose not to hire her. *Id*. Further, it is not sufficient for Ms. Davis to simply allege fact questions regarding the pretextual nature of Cintas' actions. "A defendant's proffered reason cannot be proved to be a pretext 'unless it is shown *both* that the reason was false, *and* that discrimination [or retaliation] was the real reason." *Harris v. Metro. Gov't of Nashville and Davidson County, Tennessee*, 594 F.3d 476, 486 (6th Cir. 2010), citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (quotations and emphasis in original).

In the instant case, Ms. Davis argues that four different pieces of evidence raise genuine issues of material fact regarding the pretextual nature of Cintas' decisions not to hire her: 1) that Cintas' justifications for not hiring Ms. Davis in 2003 were not applied to other male applicants; 2) that less-qualified males were hired by Cintas over Ms. Davis in 2003; 3) that Cintas "delayed" the hiring track of another female - Fawn Pomeroy - in an effort to compare Ms. Davis with Ms. Pomeroy in 2004; and 4) that less qualified males were hired by Cintas over Ms. Davis in 2004. Ultimately, none of this "evidence" satisfies Ms. Davis' burden of establishing genuine issues of material fact that Cintas' decisions not to hire her in 2003 or in 2004 were a pretext for gender discrimination.

### A. Ms. Davis' 2003 Application with Cintas.

Cintas argues that its decision not to advance Ms. Davis past the initial interview phase of the hiring process in 2003 was due the concerns of Ms. Richards - the Human Resources Manager at Location 447. In her response brief, Ms. Davis argues that the reasons given by Ms. Richards - another female - for not advancing Ms. Davis were a pretext for gender discrimination. Ms. Davis also argues that similar responses from other, male, applicants did not

similarly doom those applicants' chances of advancing in the interview process with Cintas. The Court disagrees with both of these arguments by Ms. Davis.

Again, as Cintas argues in its brief, Ms. Davis' initial screening interview with Ms. Richards raised several red flags in Ms. Richards' mind. Ms. Davis commented that she disliked "up-selling" what she considered to be heavily marked-up merchandise to customers. [Davis Dep., p.98]. Ms. Davis also told Ms. Richards that she desired to remain employed with LensCrafters in a part-time position, *Id.* at 94, and that she was currently applying with two other optical companies at the same time she was applying with Cintas. *Id.* at 99. In fact, not only had Ms. Davis pursued employment with other optical companies, *she had already accepted a full-time position with PearleVision, starting the week following her interview with Cintas*. *Id.* at 90.

Ultimately, Ms. Richards did not advance Ms. Davis further in Location 447's hiring process, simply writing "Not Best Qualified" on the applicant flow log as her reason for rejecting Ms. Davis' application. [Richards Dep., p.346]. Ms. Richards testified that Ms. Davis' gender was not a factor, in whole or in part, in her decision not to advance Ms. Davis' application. *Id*. at 382. Furthermore, Ms. Davis testified that Ms. Richards did not say or do anything inappropriate during her interview. [Davis Dep., pp.63-64].

Ms. Davis' arguments against summary judgment center around the fact that, over six years after interviewing Ms. Davis, Ms. Richards could not specifically recall interviewing Ms. Davis:

> Since Richards does not actually recall the interview, she speculates for Cintas that the comment about the part-time job *may* have raised a question in her mind about Davis' availability to work the hours of the SSR job, and that the answer about overpriced merchandise *may* have raised a doubt about her motivation to

11

sell. However, a jury could reasonably reject both speculations as false.

[Pl.'s Br., Doc. No. 577, p.9 (internal citations omitted) (emphasis in original)].

This argument, however, overlooks the fact that it is *Ms. Davis*'s burden to rebut Cintas' reasons for not hiring Ms. Davis as a pretext for gender discrimination. Even accepting Ms. Davis' arguments that Ms. Richards' finding of "Not Best Qualified" with respect to Ms. Davis' application was a pretext, Ms. Davis has offered no evidence whatsoever that her application was rejected on reasons which were *a pretext for gender discrimination*.

Ms. Davis also argues that other, male, applicants in 2003 gave similar responses to those given by Ms. Davis, but were still advanced past the initial screening phase. Davis, however, has failed to demonstrate that her qualifications "were so significantly better" than her successful male comparators that "no reasonable employer" would have chosen them over her. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627-28 (6th Cir. 2006). At best, Ms. Davis' arguments demonstrate only genuine issues of material fact regarding the pretextual nature of Cintas' decision not to hire her - *entirely devoid* from the record, however, is any indication that Cintas' decision was a *pretext for gender discrimination*. Ms. Davis' arguments to the contrary are without merit.

### B. Ms. Davis' 2004 Application with Cintas.

As with its decision not to hire Ms. Davis in 2003, Cintas argues that its decision not to hire Ms. Davis in the fall of 2004 was the due to legitimate, nondiscriminatory reasons. In her response brief, Ms. Davis argues that less-qualified men were hired over her in the fall of 2004, and that the application of Ms. Pomeroy was intentionally delayed so that Cintas could force both Ms. Pomeroy and Ms. Davis to "compete" for the same position. The Court disagrees with

both of these arguments by Ms. Davis.

As evidence of discriminatory pretext, Ms. Davis argues that Cintas failed to consider Ms. Davis for two open SSR positions for which male applicants - Jacob Toman and Chad Miskowiak - were hired in the fall of 2004. [*See* Pl.'s Br., Doc. No. 577, p.12]. Both of these individuals, Ms. Davis claims, were less qualified for SSR positions than was Ms. Davis, as they "lacked any route experience, had minimal or no sales or service experience of any kind," and both scored lower on their written tests. *Id.*

That Ms. Toman or Mr. Miskowiak *may* have been less attractive applicants at the *initial screening phase* of Location 447's application process - where these alleged deficiencies would have manifested themselves, does not demonstrate that Cintas' eventual decision to not hire Ms. Davis was a pretext for gender discrimination. Despite what Ms. Davis characterizes as the "lesser qualifications" of both Mr. Toman and Mr. Miskowiak, *Ms. Davis* was still advanced to the route ride phase of the application process. Perhaps Ms. Davis would have a stronger argument if she had not been advanced to the route ride phase of the application process while Mr. Toman and Mr. Miskowiak were given route rides, but those are not the facts of this case.

Further, the eventual reason that Ms. Davis was not hired - i.e., her efficiency on the route ride with Mr. Presendofer - *has nothing to do with Ms. Davis' allegations that Mr. Toman and Mr. Miskowiak were less qualified than she was*. At best, that Mr. Toman or Mr. Miskowiak were hired over Ms. Davis demonstrates only genuine issues of material fact regarding the pretextual nature of Cintas' decision not to hire her - *entirely devoid* from the record, however, is any indication that Cintas' decision was a *pretext for gender discrimination*. Ms. Davis' arguments to the contrary are without merit.

13

Ms. Davis also speculates that Cintas delayed Ms. Pomeroy's application "until she could be compared with Davis," [Pl.'s Br., Doc. No. 577, p.13], an argument intended to prove that Cintas was willing to hire only one woman in the fall of 2004, not two. "A jury could easily infer. . . that Pomeroy and Davis were competing for the same. . . route. . . ." *Id*. As Cintas argues, however, Ms. Davis has failed to come forward with any *evidence* to support this contention:

> Much of Davis' "evidence" is sheer speculation that should be disregarded. For example, her "hire one woman, but not two" theory is pure fabrication. There is not one iota of evidence that Pomeroy's route ride was intentionally delayed for a month so that she could be considered with Davis. Indeed, it is just as likely that the route ride was timed to accommodate Pomeroy's schedule or for some innocuous reason.

[Def.'s Reply, Doc. No. 587, pp.4-5]. The Court agrees, and finds Ms. Davis' arguments to the contrary without merit.

As with Ms. Davis' 2003 application, Ms. Davis has only, at best, come forward with evidence demonstrating genuine issues of material fact regarding *whether the reasons given by Cintas for not hiring her were pretextual*. Even if the Court were to agree with these arguments by Ms. Davis - a holding this Court does *not* reach - no evidence has been brought forth by Ms. Davis supporting an inference that Cintas' decisions *were a pretext for gender discrimination*. This evidentiary deficiency is fatal to Ms. Davis' claims for disparate treatment, and summary judgment in favor of Cintas is therefore proper.

II. <u>Davis' Disparate Impact Claims</u>.

In her Sixth Amended Complaint, Ms. Davis alleges a disparate impact gender discrimination claim. [*See* Doc. No. 331, ¶9]. Unlike a disparate treatment claim, a disparate impact claim does not require any intent to discriminate on the part of the defendant. *See Griggs*

14

*v. Duke Power Co.*, 401 U.S. 424, 432 (1971). Rather, Ms. Davis establishes a *prima facie* case by: 1) identifying the "specific employment practice" being challenged; and 2) demonstrating that the practice had an adverse effect "by offering statistical evidence of a kind or degree sufficient to show that the paractice in question has caused the adverse effect in question." *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir. 2000) (internal quotations and citation omitted). The plaintiff must also show that the identified employment practice "directly disadvantaged" her. *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 576-77 (6th Cir. 2004).

In this case, Ms. Davis "challenges the discretionary and subjective decision-making" hiring system utilized by Cintas in hiring SSRs. [Pl.'s Br., Doc. No. 577, p.3]. Ms. Davis elaborates as follows:

> . . . Cintas' SSR process "as a whole" led to the rejection of Davis and female applicants generally, based on judgments about putative "positives" and "negatives" not equally applied to male applicants who were advanced in the system and ultimately hired.

*Id*. at pp.4-5.

In support of her allegations, Ms. Davis attaches the declaration of Dr. Thomas DiPriete. [*See* DiPrete Decl., Pl.'s Ex. 1, Doc. No. 577]. In his declaration, Dr. DiPrete states that he studied Cintas' hiring rates in comparison with the availability of female applicants in the appropriate internal and external labor markets. [DiPrete Decl., ¶4]. Dr. Diprate concluded that Cintas underhired woman for SSR positions between 1999 and 2004, and specifically during the period in which Ms. Davis applied in 2003 and in 2004. *Id*. at ¶¶8-9. Ms. Davis argues that these disparities, in and of themselves, "raise. . . an inference of causation" sufficient to sustain a claim for disparate impact. [Pl.'s Br., Doc. No. 577, p.5].

As Cintas argues, however, Dr. DiPrete's statistical analysis fails as a matter of law to

15

establish a *prima facie* disparate impact claim:

> Davis fails to identify any "specific employment practice" - an essential element of a prima facie disparate impact case. She contends that she is not required to do so, and seeks instead to challenge Cintas' *entire* multi-step SSR hiring process. . . . As a matter of law, Davis must show that "the elements of [an employer's] decisionmaking process are not capable of separation for analysis." 42 U.S.C. § 2000e-2(k)(1)(B)(i). She fails to make this showing. The fact that Davis advanced to different points in the multi-step process demonstrates that the hiring process is capable of separation. Moreover, the only specific step in the hiring process that arguably adversely impacted Davis was the route ride (because she advanced past the screening interview). Davis cannot demonstrate any adverse impact, however, because it is undisputed she is the only woman who did not receive an offer as a result of the route ride.

[Def.'s Reply, Doc. No. 587, p.5 (emphasis in original)]. The Court agrees.

In *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988), the Supreme Court held that "[e]specially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is. . . responsible for isolating and identifying the specific employment practices that are allegedly responsible for any alleged statistical disparities." It is undisputed that Location 447's multi-step hiring process utilized *both* subjective elements - feedback from route ride SSRs accompanying the applicant, for example - with other, standardized elements - such as the standard questions on the initial interview, or the standardized written test required of all advancing applicants.

Ms. Davis argues, however, that the Sixth Circuit's decision in *Phillips v. Cohen*, 400 F.3d 388, 398 (6th Cir 2005), stands for the proposition that *Watson*'s requirement to isolate a single, specific employment practice is no longer required:

> . . . Cintas ignores the Sixth Circuit's decision in *Phillips*. That is, *Phillips* explicitly recognized that the 1991 amendments to Title VII had eliminated *Watson*'s requirement that the plaintiff isolate a *single specific practice* for its discriminatory effect.

16

[Pl.'s Br., Doc. No. 577, p.4 (emphasis in original)]. While partially correct, Ms. Davis ignores the *remainder* of the *Phillips* court's holding. That is, *Phillips* recognized that the 1991 amendments, codified in 42 U.S.C. § 2000e-(k)(1)(B)(i), only eliminated *Watson*'s "single specific practice" requirement in circumstances where "the elements of a respondent's decisionmaking process are not capable of separation for analysis." *Phillips*, 400 F.3d at 398. As Cintas argues, however, "[t]he fact that Davis advanced to different points in the multi-step hiring process demonstrates that the hiring process is capable of separation." [Def.'s Reply, Doc. No. 587, p.5]. The Court agrees, and finds Ms. Davis' arguments to the contrary without merit. Ms. Davis' failure to allege a "specific employment practice" by Cintas that caused an adverse effect against her application due to her gender is fatal to Ms. Davis' disparate impact claim, and summary judgment in favor of Cintas is therefore proper.

CONCLUSION

For the reasons explained above, the Court **GRANTS** Cintas' motion for summary

judgment [Doc. No. 533], and **DISMISSES** Ms. Davis' case in its entirety.

    IT IS SO ORDERED.

                S/Sean F. Cox
                Sean F. Cox
                United States District Judge

Dated: April 5, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 5, 2010, by electronic and/or ordinary mail.

                S/Jennifer Hernandez
                Case Manager