UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                                        Case Nos. 04-40132; 06-12311

       Plaintiff- Intervenor                    HONORABLE SEAN F. COX
                                    United States District Judge

v.

CINTAS CORPORATION,

       Defendant.

_____/

OPINION & ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT re: TANYA THOMPSON [Doc. No. 871]

On December 23, 2005, the Equal Employment Opportunity Commission ("EEOC") filed

complaints as an intervening plaintiff in two cases that were consolidated for pretrial purposes -

*Mirna E. Serrano, et al. v. Cintas Corp.* [Case No. 04-40132]; and *Blanca Nelly Avalos, et al. v.*

*Cintas Corp.* [Case No. 06-12311] - alleging that Defendant Cintas Corporation ("Cintas")

engaged in discriminatory hiring practices against female applicants in violation of 42 U.S.C. §

2000e-5, also known as a "Section 706" action.[1]  In March of 2010, the EEOC identified Ms.

Tanya Thompson ("Thompson") as one of thirteen individuals upon whose behalf the EEOC

brought this § 706 action.  The matter is before the Court on Cintas' motion for summary

judgment [Doc. No. 871] with respect to Ms. Thompson's claims.  The parties have fully briefed

the issues, and the Court declines to hear oral argument pursuant to E.D. MICH. L.R. 7.1(f)(2).

_____

[1] For ease of reference, all further citations to document numbers in this motion will refer to the
04-40132 case unless otherwise noted.

1

For the reasons that follow, the Court **GRANTS** Cintas' motion [Doc. No. 871], and

**DISMISSES WITH PREJUDICE** the EEOC's claims brought on behalf of Ms. Thompson.

BACKGROUND

These causes of action have already suffered through a long, complex factual and procedural history - a history already discussed by the Court in previous orders. Therefore, only those facts of particular relevance to the instant motion are included below.

Background to this Litigation

The individual plaintiffs in the *Serrano* action filed their original charge of discrimination with the EEOC on or about April 7, 2000 - over a decade ago. [*See Serrano* Complaint, Doc. No. 1, ¶7]. Two years later, in June of 2002 - the EEOC issued a determination that reasonable cause existed to believe Cintas had engaged in discriminatory hiring practices. [*See* Doc. No. 1, Ex. A]. After two more years, in May of 2004, the EEOC formally declined to issue a right to sue letter - at which time the *Serrano* individual plaintiffs filed their lawsuit in this action. *Id*.

Roughly a year and a half after that - on December 23, 2005 - the EEOC filed suit as an intervening plaintiff in this action. [*See* Doc. No. 98]. The EEOC's first complaint brought actions under §§ 705 and 706. The EEOC also filed an amended complaint on August 20, 2009.

Since that time, the Court has denied both the *Serrano* and *Avalos* plaintiffs' motions for class-action certification [*see* Doc. No. 627] - and the Sixth Circuit has denied motions for interlocutory appeal. [*See* Doc. Nos. 632, 633]. All individual plaintiffs in the *Avalos* matter have had their cases either dismissed, settled, or otherwise resolved [*see* Case No. 06-12311, Doc. No. 647], as is also the case with all plaintiffs in the *Serrano* matter save for Mirna E.

Serrano herself.[2] [*See* Doc. No. 712, 722, 732]. Practically speaking, therefore, all that remains of the *Serrano* and *Avalos* matters is the EEOC's § 706 claims against Cintas.

On October 21, 2009, Cintas filed a motion [Doc. No. 662], seeking to preclude the EEOC from proceeding under the "pattern or practice" framework announced by the U.S. Supreme Court in *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). In opposition to that motion, the EEOC argued that it was entitled to pursue a "pattern or practice" action under the *Teamsters* framework - traditionally reserved for § 707 actions - in this action brought under § 706. [*See* Doc. No. 664].

On February 9, 2010, the Court granted Cintas' motion [Doc. No. 662], holding that the EEOC was precluded from advancing its § 706 claims against Cintas under the "pattern or practice" framework announced by the U.S. Supreme Court in *Teamsters*, but instead must proceed under the framework in *McDonnell-Douglas Corp. v. Green*, 422 U.S. 792 (1973). [*See* Doc. No. 723, p.21]. The Court denied the EEOC's motion to certify the issue for interlocutory appeal [*see* Doc. No. 752], and then subsequently denied the EEOC's second motion to amend the complaint to add a "pattern or practice" cause of action under § 707. [*See* Doc. No. 829].

The EEOC was required to disclose the names of all individuals upon whose behalf it was bringing this § 706 suit against Cintas no later than March 23, 2010. [*See* Doc. No. 735, p.16]. Though forty-six females were initially listed by the EEOC as having claims in this action, that number has since been pared to thirteen individual females - one of whom is Tanya Thompson, the subject of this motion - who applied for SSR positions with Cintas at its Detroit, Michigan

---

[2] Cintas' motion to dismiss the claims of Ms. Serrano [Doc. No. 881] is currently pending before this Court, which is unopposed by Ms. Serrano [Doc. No. 881, p.4] - though the EEOC opposes the Court granting the motion. [*See* Doc. No. 884].

("Location 681/721") and Westland, Michigan ("Location 300") facilities in 2001 and 2002.

The SSR Position and SSR Hiring Procedures at Locations 681/721 and 300

Cintas' SSR position is a sales and route driver position. Generally speaking, the position requires driving a truck, selling Cintas' goods and services, and servicing current Cintas accounts for laundry, uniforms and linen products. As the Court previously held in the *Avalos* matter:

> SSRs drive trucks and deliver clean uniforms, mats and supplies to specific customers on their assigned routes. . . SSRs must insure that their trucks are properly loaded with the correct uniforms and products to fulfill the needs of specific customers. As they visit each account, they are tasked with increasing sales and maintaining customer satisfaction at the highest possible level.

[Case No. 06-12311, Doc. No. 186, pp.5-6].

Though policies and procedures for each Cintas location are set by Cintas' corporate headquarters, each Cintas location engages in a decentralized hiring process for SSR applicants - in other words, each Cintas location hires its own SSRs. During 2001 and 2002, however, the hiring process at Location 681/721 was quite similar to that at Location 300. At all times relevant to this motion, Ms. Holly Woonton served as the Human Resources Manager for several Cintas facilities in Michigan, including Location 681/721. [*See* Woonton Dep., Def.'s Ex. 5, Doc. No. 858, pp.10, 23].

It was Ms. Woonton's responsibility, as HR Manager, to review and screen SSR applications and resumes. *Id*. at 10. When screening applicants, Ms. Woonton would:

> . . . see what their employment looked like, what type of experiences they had. Again. . . how many positions they had, reasons for leaving, and whether or not they had customer service or sales experience.

*Id*. at 19.

For Location 681/721, Ms. Woonton would generally screen all applications when an

4

SSR position needed to be filled. *Id*. at 10, 23. Honesty was considered by Cintas to be a quality needed in all successful SSR applicants. [Woonton Decl., Def.'s Ex. 9, Doc. No. 859, ¶¶10-11] - a fact previously noted by the Court in prior opinions in this litigation. [*See* Doc. No. 511, p.4]. Having a college degree was a plus for an SSR candidate's application, as well as a referral from a current Cintas employee. [Woonton Dep., p.35].

If a candidate advanced beyond an initial applicant screening, the interview process began with an initial screening interview - conducted by HR using standard, pre-set questions for the applicant. *Id*. at 21, 24. If a candidate advanced past this stage, two in-depth interviews would be conducted by other service managers, then a ride-along with another SSR for a shift, followed by a final meeting with Location 681/721's General Manager. [Woonton Decl., Def.'s Ex. 6, Doc. No. 858, ¶7].

For Location 300, the application process was overseen by that facility's General Manager, who during the time relevant to this lawsuit was Mr. David Armbrester. [Armbrester Dep., Def.'s Ex. 7, Doc. No. 858, p.19]. The hiring process generally consisted of an application screening, following by initial intake interview for those passing the initial screening. *Id*. at 18-19. Next, advancing applicants would have two in-depth interviews with Location 300 service managers, followed by a "ride along" opportunity to work a shift with an actual SSR to see the position first hand. The final interview took place after the ride-along, and was conducted by Mr. Armbrester. *Id*. at 12.

Mr. Armbrester testified that, in reviewing applications on the initial screening, "the most important things I was looking for were [a] high school diploma, good driving record [and] preferably someone who had customer service and sales. . . experience on their resume." *Id*. at

20.  Further, he considered a "good driving record, kind of a friendly disposition, good customer service, good people skills, [and] a high school diploma" as "must-have[]" qualities in a successful SSR applicant, and "selling experience, customer service [and] leadership experience" as "preferred" qualities.  *Id*. at 29-30.

Location 300 preferred applicants with a stable job history, as this would give Cintas some assurance that the applicant would stay in the SSR position after Cintas had invested time and money on training the employee. [Armbrester Decl., Def.'s Ex. 10, Doc. No. 858, ¶5].  Mr. Armbrester also preferred applicants referred from an existing Cintas employee. [Armbrester Dep., pp.55-56].  In addition, Location 300 also favorably viewed applicants with prior military service, as these applicants - in Mr. Armbrester's experience - tended to demonstrate leadership skills, dedication, commitment, and a team attitude. [Armbrester Decl., ¶16].

At all times relevant to this litigation, Cintas had in effect a company-wide policy prohibiting unlawful discrimination on the basis of gender in hiring and other employment-related actions. [*See* Case No. 06-12311, Doc. No. 632, pp.3-4].

<u>Tanya Thompson</u>

Ms. Thompson was not involved in this litigation until the EEOC sent her a solicitation letter in October of 2009. [Thompson Dep., Def.'s Ex. 4, Doc. No. 871, pp.11, 81].  Ms. Thompson submitted two separate applications to Cintas locations - an application to Location 300 on August 25, 2001 [*see* Def.'s Ex. 6-A, Doc. No. 871], and an application to Location 681/721 on March 16, 2002. [*See* Def.'s Ex. 10-A, Doc. No. 871].

<u>The August 2001 Application to Location 300</u>

Ms. Thompson originally learned of job openings at Location 300 from an online job

posting through a site known as "Michigan Works." [Thompson Dep., p.13]. Ms. Thompson

attended an open house at Location 300 on August 25, 2001, at which time she filled out an

employment application. [*See* First Thompson Application, Def.'s Ex. 6-A, Doc. No. 671;

Thompson Dep., p.13]. She received an interview that day, which lasted approximately twenty

to thirty minutes. [Thompson Dep., pp.17-17, 26, 28].

As a result of this interview - which Ms. Thompson conceded did not give her cause to

believe she had been discriminated against [*See id.* at 26-27] - Ms. Thompson thought that she

would likely be advanced in the hiring process. Her deposition testimony, however,

demonstrates that the Cintas interviewer did not specifically state that she was being advanced in

the hiring process at that time:

> Q:     . . . while you were sitting in the office, is there anything else that you
>        recall about the interview?
> A:     He said that he had a number of applicants and *he would look over my
>        application* and *he had a lot of more interviewing to do* and he would call
>        me for a second interview because my qualifications looked like
>        something they was [*sic*] interested in *but he had to go through a lot of
>        other applicants* and he would call me for a second interview.

*Id*. at 25 (emphasis added). Thus, while the interviewer may have had a favorable opinion of Ms.

Thompson's application *at that time*, the interviewer was clear to Ms. Thompson that other

applicants still needed to be interviewed - and Ms. Thompson's application would have to be

screened - before second interview decisions were made.

Ms. Thompson ultimately did not receive a second interview at Location 300. Her

application - which the interviewer told her would be reviewed *after the initial interview*,

contained the following language which Ms. Thompson agreed to as indicated by her signature:

The information contained in this application is true to the best of my knowledge

> and belief, and I understand and agree that any misrepresentation or false or incomplete statement by me in connection with the application will constitute justifiable cause for Cintas not to employ me or, if employed, to terminate my employment at any time.

[First Thompson Application, Def.'s Ex. 6-A]. Ms. Thompson's application, however - which the interview had not had an opportunity to verify the accuracy of before the interview - contained numerous material misrepresentations of her prior employment history.

For instance, Ms. Thompson failed to list two prior positions on her application to Location 300. Ms. Thompson admitted at her deposition that she had worked at Great Lakes Leasing from March of 1999 until January 2000, and for Tube City Company from October 2000 to February of 2002. [Thompson Dep., pp.20-21, 165-66]. Neither of these positions were disclosed by Ms. Thompson on her August 2001 application. The later of these positions would have been *currently held* by Ms. Thompson while she was applying - the Tube City position - where she admitted having a history of excessive absences.[3] *Id*. at 146.

Further, Ms. Thompson wrote on her application that she had been employed by L&W Engineering from November 1997 through April of 2001 - when in reality Ms. Thompson left L&W in February of 1999. This discrepancy is particularly troublesome in light of the fact that her leaving L&W in April of 2001 would have *completely overlapped the time she was at Great Lakes Leasing* - a position that Ms. Thompson mentioned again and again in her August 2001 interview as supporting her claim that she had experience in the route sales industry. [*See, e.g.,* Thompson Dep., pp.20-23].

---

[3] In fact, Ms. Thompson was ultimately terminated from the Tube City position due to excessive absences - though that termination was not until February of 2002, months after her August 2001 application with Location 300.

Ms. Thompson claims that she informed her interviewer that she had experience in the relevant field - again, through her employment at Great Lakes Leasing. This position was characterized by Ms. Thompson as a "route sales" position, *id*. at 21, though it appears from the remainder of her testimony that the bulk of her assignments were simply delivering goods, including furniture, to customers. *Id*. at pp.21-23. Ms. Thompson also possessed a commercial driver's license at the time of her August 2001 application to Location 300. *Id*. at 27. These experiences and qualifications, arguably, would have been viewed in a positive light by Cintas.

Again, Ms. Thompson was ultimately not selected for a second interview as a result of her August 2001 application with Location 300. Mr. Nafal Maktari submitted an application at Location 300 on the same day as Ms. Thompson, and was hired on October 1, 2001. Mr. Maktari, in Cintas' view, had significant prior sales, customer service, and management experience. [Armbrester Decl., Def.'s Ex. 6, Doc. No. 871, ¶17]. Mr. Maktari was also a veteran of the United States Army. *Id*. Finally, Mr. Maktari also was fluent in Arabic, which Location 300's managers saw as a unique asset for dealing with the large number of Arabic-speaking customers serviced by Location 300. *Id*. at ¶18.

<u>The March 2002 Application to Location 681/721</u>

Ms. Thompson again applied for an SSR position with Cintas - this time at Location 681/721 - on March 16, 2002. On that day, Ms. Thompson claimed that she visited the Location 681/721 facility in Detroit, Michigan, and received an interview.[4] The second interviewer

---

[4] Cintas disputes whether this second interview ever took place. [*See* Def.'s Br., Doc. No. 781, p.9 ("There is, in fact, no evidence that anyone at Cintas actually reviewed Ms. Thompson's application")]. Consistent with Fed. R. Civ. P. 56's requirement that the Court draw all inferences in favor of the non-moving party, however, the Court will presume for purposes of this motion that Ms. Thompson *did* receive an interview on March 16, 2002.

allegedly told Ms. Thompson that he was impressed with her qualifications, that she was immediately passed to another manager for a second interview, and then was told by that interviewer - contrary to Location 681/721's hiring policy of scheduling a route-ride before making a hiring decision - that she was immediately hired. [*See* Thompson Dep., Pl.'s Ex. Y, Doc. No. 893, p.53 ("He told me that I was hired for the position")]. Ms. Thompson does not recall either of the individuals whom she claims she interviewed with as a result of this application.

Ms. Thompson's March 16, 2002 application contained the same paragraph regarding misrepresentations and omissions as did her August 25, 2001 application. [Second Thompson Application, Def.'s Ex. 10-A, Doc. No. 871]. Again, as on her August 25, 2001 application with Location 300, Ms. Thompson's March 16, 2002 application neglected to include her prior positions with either Great Lakes Leasing or with Tube City - curious especially with respect to the Tube City position, as Ms. Thompson testified in her deposition that this job terminated in February of 2002 - *only roughly a month before she had applied to Location 681/721*. [Thompson Dep., p.166]. Further, Ms. Thompson conceded at her deposition that her employment with Tube City had been terminated due to her excessive absences. *Id*. at 146.

Again, Ms. Thompson was ultimately not selected for employment as a result of her March 2002 application with Location 681/721. Mr. Timothy Wollner applied to the same location on the same day as did Ms. Thompson, and ultimately was hired on April 1, 2002. Like Mr. Maktari, Mr. Wollner was a veteran of the armed forces - in Mr. Wollner's case, he was a former member of the United States Marine Corps, where he had advanced to the rank of sergeant in only six years. [Woonton Decl., Def.'s Ex. , Doc. No. 871, ¶19]. As explained

10

*supra*, Cintas saw prior military experience as a positive for potential candidates, finding the discipline, leadership skills and commitment developed during military service to be relevant to the SSR position. *Id*. at ¶17.

### Cintas' Instant Motion for Summary Judgment

Following the close of discovery in this action, Cintas filed this motion for summary judgment [Doc. No. 871] on July 14, 2010. In this motion, Cintas argues that the EEOC's claims on behalf of Ms. Thompson fail on their merits as a matter of law.[5] The EEOC opposes Cintas' motion. [Doc. No. 893]. The matter is now ripe for decision by the Court.

## STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

---

[5] In addition to summary judgment motions attacking the merits of each of EEOC's thirteen individually-named plaintiffs, Cintas has also filed an omnibus motion attacking each of these named plaintiffs for procedural reasons - namely, the EEOC's failure to exhaust administrative remedies before filing this lawsuit. [*See* Doc. No. 836]. Notwithstanding the EEOC's arguments to the contrary [*see* EEOC's Br., Doc. No. 893, n1], the Court will address the merits of Ms. Thompson's claims in this order, and will address the EEOC's alleged failure to exhaust administrative remedies on all named plaintiffs in a separate order.

ANALYSIS

In its instant motion [Doc. No. 871], Cintas argues that the EEOC's suit on behalf of Ms. Thompson should be dismissed for two reasons: 1) because Ms. Thompson was not "qualified" for an SSR position, and therefore cannot advance a *prima facie* case of discrimination; and 2) because the EEOC cannot demonstrate that Cintas' decision not to hire Ms. Thompson - on either application - was a pretext for gender discrimination. As the Court agrees with both of these arguments, dismissal of the EEOC's claims on behalf of Ms. Thompson is proper.

Section 706 permits the EEOC to sue a private employer on behalf of a "person or persons aggrieved" by an employer's unlawful employment practice. 42 U.S.C. § 2000e-5(f)(1). The EEOC is "master of its own case" when bringing suits on behalf of aggrieved persons in a § 706 lawsuit, and may bring such suits with or without the consent of the aggrieved persons. *EEOC v. Waffle House*, 534 U.S. 279, 291-92 (2002). "Nonetheless, it is axiomatic that the EEOC stands in the shoes of those aggrieved persons in the sense that it must prove all the elements of their [discrimination] claims to obtain individual relief for them." *EEOC v. CRST Van Expedited, Inc.*, 611 F.Supp.2d 918, 929 (N.D. Iowa 2009).

Absent evidence of intentional discrimination, the EEOC must pursue § 706 claims brought on behalf of aggrieved individuals under the familiar burden-shifting scheme outlined in *McDonnell-Douglas Corp. v. Green*, 422 U.S. 792 (1973). *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760 (4th Cir. 1998); *see also Serrano v. Cintas Corp.*, - - F.Supp.2d. - -, 2010 WL 522846 (E.D. Mich. Feb. 9, 2010). Under the *McDonnell-Douglas* framework, plaintiffs must first establish a *prima facie* case of discrimination. *McDonnell-Douglas*, 422 U.S. at 802. Once the plaintiff has established a *prima facie* case of discrimination, the burden of production

shifts to the employer to rebut the plaintiff's *prima facie* case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. If the employer articulates such a legitimate, nondiscriminatory reason, the plaintiff bears the burden of proving that the employer's articulated reason is a pretext for discrimination. *Id*. The Court will consider each of these issues in turn.

I. The EEOC's *Prima Facie* Case on Behalf of Ms. Thompson.

To establish a *prima facie* case of discriminatory hiring practices, a plaintiff without direct evidence of discrimination must show that 1) she belonged to a protected class; 2) she applied and was qualified for a job for which the employer was seeking applicants; 3) despite her qualifications, she was rejected; and 4) after her rejection, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications. *See McDonnell-Douglas*, 411 U.S. at 802. In this case, Cintas only disputes the second of these requirements with respect to Ms. Thompson's applications: that Ms. Thompson was not "qualified" for an SSR position due to her lack of honesty in completing the applications. The Court agrees.

In *Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003), the Sixth Circuit elaborated on the requirements of the "qualified" element of a *prima facie* discrimination claim. The *Wexler* Court held that, "[a]t the prima facie state, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler*, 317 F.3d at 575 (emphasis in original). To meet this burden, plaintiffs need only "present[] credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id*. at 576. The Sixth Circuit elaborates

as follows:

> Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrating possession of the required skills.

*Wexler*, 317 F.3d at 576.

In support of its argument that Ms. Thompson was not "qualified" for a position with either Location 300 or Location 681/721, Cintas argues as follows:

> This Court has already found that "basic honesty was an objective qualification for a position with Cintas" and that a claimant who "had lied on his employment application, even though the application stated several times with clear language that complete and accurate information was required. . . was thus not qualified for the job sought and. . . failed to establish a *prima facie* case of discrimination." (Dkt 511 at 4.)  Here. . . Ms. Thompson's application materials were riddled with misrepresentations, half-truths, and incomplete statements.  She failed to demonstrate the basic honesty that Cintas requires for SSRs.

[Def.'s Br., Doc. No. 871, p.14].  The Court agrees.  The EEOC's response brief - containing an entire section devoted to why Ms. Thompson can meet her *prima facie* requirement to show she was "qualified" for an SSR position - does not even address the honesty issues raised by Cintas.

[*See* EEOC's Br., Doc. No. 893, pp.7-12].  Though the EEOC later discusses how Ms. Thompson's credibility is ultimately a question for the jury, *id*. at 15-16, this argument does nothing to explain the gross discrepancies between Ms. Thompson's two applications and reality.

While credibility determinations generally are a question of fact for the jury, Ms. Thompson admitted *at her deposition* that she applied for the Location 300 position *while she was still employed* at Tube City, and applied for the Location 681/721 position *only a month after she was fired* from Tube City.  Ms. Thompson addressed her inability to recall dates with exact specificity, and explained as follows in her deposition:

> . . . That's just an estimated time of my dates [of employment]. I mean, if you look through my history, I might could [*sic*] tell you I worked such and such date and it might not be. That's the best of my knowledge. That's all I can - - I mean, I don't know exact dates. Even when you ask me now, I don't know the exact time - - I can't give a time frame because I had so many employers. . . .

[Thompson Dep., p.158]. Even *if* Ms. Thompson cannot recall with exact specificity the dates of her prior employment, *this does nothing to explain her "inability" to recall her current position, or the position she was fired from only a month previously*.

On the facts presented, the Court finds Ms. Thompson was not "qualified" for an SSR position with Cintas for purposes of prong one of the *McDonnell-Douglas* inquiry. Summary judgment on the EEOC's *prima facie* claim is therefore proper, and Cintas' arguments to the contrary are without merit.

II. Cintas' Legitimate, Nondiscriminatory Rationale for Not Hiring Ms. Thompson.

Even assuming, *arguendo*, that Ms. Thompson *was* qualified for a position with Cintas, Cintas argues that it has satisfied its requirement to proffer a legitimate, nondiscriminatory rationale for not hiring Ms. Thompson:

> Even if the EEOC could make a *prima facie* showing of discrimination, Cintas has pointed to multiple legitimate, non-discriminatory reasons for why it did not hire Ms. Thompson, including her unstable job history, lack of sales experience and lack of customer service experience. Moreover, a more qualified candidate at each location was interviewed and hired at about the same time Ms. Thompson applied.

[Def.'s Br., Doc. No. 871, p.15].

In their brief in opposition to Cintas' motion [Doc. No. 893], the EEOC's argument against Cintas' legitimate, nondiscriminatory rationale, in its entirety, is as follows:

> Cintas has no evidence to establish why it did not hire Ms. Thompson. To the contrary, the company forthrightly admits that no Cintas employee recalls Ms.

Thompson's applications or interviews.

[EEOC's Br., Doc. No. 893, p.13 (footnoted material omitted)]. This argument, however, is unavailing. On the facts of this case, there is nothing wrong with Cintas's proffered argument advancing reasons why *it would not have hired Ms. Thompson*. The EEOC offers no authority for its proposition that employers cannot offer rationales for why they would not have hired an applicant when no managerial employee specifically remembers reviewing that candidate's application. For purposes of this motion, therefore, the Court holds that Cintas' proffered rationales for not hiring Ms. Thompson are legitimate and nondiscriminatory, and the EEOC's arguments to the contrary are without merit. Thus, the Court will consider the third and final prong of the *McDonnell-Douglas* inquiry - the EEOC's ability to demonstrate that Cintas' rationales for not hiring Ms. Thompson were a pretext for gender discrimination.

III. <u>The EEOC's Case for Pretext</u>.

Cintas argues that the EEOC is unable to demonstrate that Cintas' asserted reasons for not hiring Ms. Thompson are pretextual. [Def.'s Br., Doc. No. 871, pp.15-16]. The Court agrees, and therefore **GRANTS** Cintas' motion for summary judgment [Doc. No. 871].

The Sixth Circuit has held that pretext can be shown:

> . . . in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's decision.

*Chen v. Dow Chemical Corp.*, 580 F.3d 394, 400 (6th Cir. 2009), citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004). To carry its burden in opposing summary judgment, the EEOC must produce sufficient evidence from which a jury could reasonably reject Cintas' explanation of why it chose not to hire Ms. Thompson. *Id*. Further, it is not sufficient

16

for the EEOC to simply allege fact questions regarding the pretextual nature of Cintas' actions.

"A defendant's proffered reason cannot be proved to be a pretext 'unless it is shown *both* that the reason was false *and* that discrimination was the real reason.'" *Harris v. Metro. Gov't of Nashville and Davidson County, Tennessee*, 594 F.3d 476, 486 (6th Cir. 2010), citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (quotations and emphasis in original).

The EEOC relies upon two primary arguments in support of pretext: 1) statistical evidence of Cintas' hiring practices, and 2) comparisons between Ms. Thompson's qualifications and those of the individuals ultimately hired by Cintas. Neither of these , however, establish that Cintas' failure to hire Ms. Thompson was a pretext for gender discrimination.

The EEOC argues that statistical evidence of Cintas' hiring practices demonstrates the pretextual nature of Cintas' rationale for not hiring Ms. Thompson:

> The statistical and anecdotal evidence of a pattern or practice of discrimination, including the failure to hire any women at location 354[6] in and around the time that Ms. Thompson applied (out of 32 SSRs hired), is additional evidence to reject Cintas' *post hoc* justifications for nor hiring her.

[EEOC's Br., Doc. No. 893, p.17].

In discussing how such evidence could potentially assist a plaintiff in showing the pretextual nature of an employer's adverse actions against him or her, the Sixth Circuit has held as follows:

> [O]ther probative evidence of discrimination. . . taken together with the evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment.

---

[6] Ms. Thompson never, in fact, applied to Location 354 - though other applicants included in the thirteen named plaintiffs the EEOC has brought this action on behalf of did apply there. Rather, Ms. Thompson only applied with Locations 300 and 681/721.

*Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 392 (6th Cir. 2009), citing *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 626-27 (6th Cir. 2006). Here, the EEOC argues that Ms. Thompson was more qualified for an SSR position than were other male applicants who were hired - discussed *infra*. This, coupled with the statistical evidence proffered, the EEOC argues, is sufficient to rebut Cintas' rationale as pretextual. [EEOC's Br., Doc. No. 871, p.17]. The Court disagrees.

In *Risch*, the Sixth Circuit considered the claims of a female police officer who was allegedly passed over for a detective position with her police department because she was a woman. *Risch*, 581 F.3d at 385. The police department passed over her "in favor of two male applicants who had lower scores than Risch under the promotion system used by the Department." *Id*. While the EEOC's quote from *Risch*, noted *supra*, is accurate, the "other probative evidence" relied upon in *Risch* was as follows:

> The record also contains other evidence probative of pretext. The record indicates that male officers frequently made degrading comments regarding the capabilities of female officers, expressed the view that female officers would never be promoted to command positions, and made generally degrading remarks about women.

*Risch*, 581 F.3d at 392. These statements, the Sixth Circuit held, "evidence a discriminatory atmosphere in the Department in which male officers frequently made derogatory or discriminatory remarks about female officers." *Id*. at 393. Thus, the Sixth Circuit held, the plaintiff in *Risch* had presented enough evidence to survive summary judgment:

> In light of the above evidence of a discriminatory atmosphere in the Department, the lack of women in command positions at the Department, and the evidence that Risch was arguably better qualified than the two male applicants promoted in 2005, we conclude that Risth has produced sufficient evidence to establish a genuine issue of material fact concerning whether the Department's proffered

legitimate, nondiscriminatory reason was pretextual.

*Id*. at 394.

Here, by contrast, the EEOC's "other evidence" is limited to the statistical analysis of Dr. Thomas DiPrete. [*See* EEOC's Ex. BB, Doc. No. 901]. In his expert report, Dr. DiPrete examined all SSR hirings at Cintas locations in Michigan from 1999 to 2005, and found that, of the 427 SSR hirings in the state of Michigan during that time, only 24 - or approximately 5.6% - were female. [*See* DiPrete Report, EEOC's Ex. BB, Doc. No. 901, p.5; EEOC's Br., Doc. No. 893, p.1]. Based on Dr. DiPrete's analysis, the EEOC goes on to argue as follows:

> Comparing the estimated availability with the females hired, Dr. DiPrete noted a pattern of under hiring that was statistically significant beyond the threshold of two standard deviations. That is, it is highly unlikely that the pattern of under hiring females at Cintas occurred by chance alone.

[EEOC's Br., Doc. No. 893, pp.2-3]. The Court, however, disagrees.

In *Bowdish v. Continental Accessories, Inc.*, 1992 WL 133022 (6th Cir. June 12, 1992), the Sixth Circuit rejected that plaintiffs' attempts to use anecdotal evidence as evidence of discriminatory pretext. The *Bowdish* Court then held that anecdotal or statistical evidence, on its own, is insufficient to establish pretext:

> . . . such evidence, standing alone, still would not be sufficient to establish a case of individual disparate treatment. An individual plaintiff in an employment discrimination case must present some evidence that demonstrates that his or her individual discharge was the result of discrimination.

*Bowdish*, 1992 WL 133022, *5. Therefore, the EEOC's attempt in this litigation to demonstrate the pretextual nature of Cintas' failure to hire Ms. Thompson by statistical or anecdotal evidence is insufficient. Dr. DiPrete admitted as much at his deposition, when he stated that he could not express any opinion in regards to why any individual named plaintiff may not have been hired.

[*See* DiPrete Dep., Def.'s Ex. 3, Doc. No. 911, pp.67-69, 136-37].

Further, the EEOC's attempt to bootstrap a pretext finding based upon cobbled-together anecdotes from individuals commenting on other locations and times than Ms. Thompson's applications to Locations 300 and 681/721, from statistics relating to the purported hiring patterns of other Cintas locations, and from the concurrently-filed cases of the other twelve named plaintiffs in this matter, each also fail to demonstrate pretext in this matter. "Other location" and "other time" hiring decisions are irrelevant on the question of whether Locations 300 and 681/721 refused to hire Ms. Thompson when she applied because of her gender. *See, e.g., Davis v. Hammonds*, 103 Fed. Appx. 51, 53 (8th Cir. 2004); *Shaw v. Monroe County*, 1996 WL 426483 (E.D. Mich. Apr. 18, 1996).

Finally, even if statistics alone *could* warrant consideration as evidence of pretext in this matter, the EEOC's statistics are merely "statistics without correlation," which "are indicative of no meaningful inference or conclusion." *Shaw*, 1996 WL 426483, *8, quoting *Long v. City of Saginaw*, 911 F.2d 1192, 1201 (6th Cir. 1990). In *Long*, the Sixth Circuit rejected statistics which purported to show the availability of minority candidates for the Saginaw Police Department. In that case, the "available labor pool" used to calculate the statistics was held to be *too broad in scope*, because it included all individuals identified as working in "protective services" by the U.S. Census Bureau - a classification that included "bouncers, camp guards, school-crossing guards, meter maids. . . life guards, dog catchers, [and] bodyguards[,]" to name but a few examples. *Long*, 911 F.2d at 1200.

Here, by contrast, the EEOC's statistical analysis by Dr. DiPrete is even broader than the available labor pool utilized in *Long* - it includes census labor groupings such as human resource

managers, computer support specialists, clergy, elementary and middle school teachers, artists, cooks, counter attendants and convenience store clerks, receptionists, and office clerks within its calculations of the available labor pool. While the EEOC vigorously disputes the propriety of basing the available labor pool for SSR positions on a single census occupation code - 913, relating to driver/sales workers and truck drivers [*see* Doc. No. 833, pp.12-17] - *clearly* the EEOC's own statistics draw from far too broad an available labor pool - and thus overly inflate female availability for SSR positions. For these reasons, the EEOC has not proffered the type of "other probative evidence" discussed in *Risch* as sufficient to survive summary judgment.

Again, save for the EEOC's statistical evidence proffered by Dr. DiPrete, the EEOC's sole evidence to demonstrate pretext on behalf of Ms. Thompson is limited to the argument that Ms. Thompson was more qualified for an SSR position than were any of the men who were hired instead of her. [*See* EEOC's Br., Doc. No. 893, p.16 ("Ms. Thompson was more qualified than the males Cintas hired")]. These comparative qualifications, the EEOC argues, demonstrate the pretextual nature of Cintas' failure to hire Ms. Thompson.

The Court disagrees. As the Sixth Circuit commented in *Bender v. Hecht's Dept. Stores*, 455 F.3d 612 (6th Cir. 2006):

> Of course, acknowledging that evidence of comparative qualifications may be probative of pretext is a far cry from holding that such evidence is itself sufficient in all cases to raise a genuine issue of fact of discriminatory motive. For we need to balance the Supreme Court's statement in *Burdine* [that qualifications evidence may be probative of whether the employer's reasons are pretexts for discrimination] with the principles that employers are generally free to choose among qualified candidates, and that the law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. . . a rejected applicant must show that a reasonable jury could conclude that the actual reasons offered by the defendant were a mere pretext for unlawful []discrimination, not that other reasonable decision-makers might have retained

the plaintiff.

*Bender*, 455 F.3d at 626 (internal citations and quotations omitted). The *Bender* Court went on

to hold as follows:

> On the other hand, in the case in which there is little or no other probative
> evidence of discrimination, to survive summary judgment the rejected applicant's
> qualifications must be *so significantly better than the successful applicant's
> qualifications that no reasonable employer would have chosen the latter applicant
> over the former*. In negative terms, evidence that a rejected applicant was as
> qualified or marginally more qualified than the successful candidate is
> insufficient, in and of itself, to raise a genuine issue of material fact that the
> employer's proffered legitimate, non-discriminatory rationale was pretextual.

*Bender*, 455 F.3d at 627 (emphasis added).

The EEOC has failed, however, to demonstrate that Ms. Thompson's qualifications were

"so significantly better" than those of either Mr. Maktari or Mr. Wollner that "no reasonable

employer would have chosen the latter applicant[s] over the former." *Bender*, 455 F.3d at 627.

Further, to allow these type of side-by-side comparisons of Ms. Thompson's qualifications to

those of successful applicants - absent other probative evidence of discrimination - would, in the

words of the *Bender* Court:

> . . . move this court from its proper role of preventing unlawful employment
> practices to the illegitimate role of acting as a "super personnel department,"
> overseeing and second-guessing employers' business decisions.

*Bender*, 455 F.3d at 628, quoting *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388,

390 (10th Cir. 1983). Even assuming, *arguendo*, that Ms. Thompson would have appeared to be

a more qualified candidate for a Cintas SSR position than either Mr. Maktari or Mr. Wollner - a

holding this Court emphatically does *not* reach in this opinion - the Court holds that the EEOC

has failed to demonstrate that Ms. Thompson's qualifications were "so significantly better" that

"no reasonable employer would have chosen the latter applicant[s] over the former." *Bender*, 455 F.3d at 627.

Even assuming that the EEOC could show that Cintas' purportedly legitimate, nondiscriminatory reasons for not hiring Ms. Thompson were pretextual, the EEOC has failed to offer any evidence raising a genuine issue of material fact that these reasons were a pretext for gender discrimination. This evidentiary failure is fatal to the EEOC's claim on behalf of Ms. Thompson in this litigation, and summary judgment in Cintas' favor is therefore proper. The EEOC's arguments to the contrary are without merit.

CONCLUSION

For the reasons explained above, the Court **GRANTS** Cintas' motion for summary judgment [Doc. No. 871], and **DISMISSES WITH PREJUDICE** the EEOC's claim brought on behalf of Ms. Thompson.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: September 3, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 3, 2010, by electronic and/or ordinary mail.

s/Jennifer Hernandez
Case Manager