UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                                          Case Nos. 04-40132; 06-12311

       Plaintiff- Intervenor                    HONORABLE SEAN F. COX
                                      United States District Judge

v.

CINTAS CORPORATION,

       Defendant.

_____/

OPINION & ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT re: LORI SCHELSKE [Doc. No. 852]

On December 23, 2005, the Equal Employment Opportunity Commission ("EEOC") filed

complaints as an intervening plaintiff in two cases that were consolidated for pretrial purposes -

*Mirna E. Serrano, et al. v. Cintas Corp.* [Case No. 04-40132]; and *Blanca Nelly Avalos, et al. v.*

*Cintas Corp.* [Case No. 06-12311] - alleging that Defendant Cintas Corporation ("Cintas")

engaged in discriminatory hiring practices against female applicants in violation of 42 U.S.C. §

2000e-5, also known as a "Section 706" action.[1]  In March of 2010, the EEOC identified Ms.

Lori Schelske ("Schelske") as one of thirteen individuals upon whose behalf the EEOC brought

this § 706 action.  The matter is before the Court on Cintas' motion for summary judgment [Doc.

No. 852] with respect to Ms. Schelske's claims.  The parties have fully briefed the issues, and the

Court declines to hear oral argument pursuant to E.D. MICH. L.R. 7.1(f)(2).  For the reasons that

_____

[1] For ease of reference, all further citations to document numbers in this motion will refer to the
04-40132 case unless otherwise noted.

1

follow, the Court **GRANTS** Cintas' motion [Doc. No. 852], and **DISMISSES WITH PREJUDICE** the EEOC's claim brought on behalf of Ms. Schelske.

BACKGROUND

These causes of action have already suffered through a long, complex factual and procedural history - a history already discussed by the Court in previous orders. Therefore, only those facts of particular relevance to the instant motion are included below.

<u>Background to this Litigation</u>

The individual plaintiffs in the *Serrano* action filed their original charge of discrimination with the EEOC on or about April 7, 2000 - over a decade ago. [*See Serrano* Complaint, Doc. No. 1, ¶7]. Two years later, in June of 2002 - the EEOC issued a determination that reasonable cause existed to believe Cintas had engaged in discriminatory hiring practices. [*See* Doc. No. 1, Ex. A]. After two more years, in May of 2004, the EEOC formally declined to issue a right to sue letter - at which time the *Serrano* individual plaintiffs filed their lawsuit in this action. *Id*.

Roughly a year and a half after that - on December 23, 2005 - the EEOC filed suit as an intervening plaintiff in this action. [*See* Doc. No. 98]. The EEOC's first complaint brought actions under §§ 705 and 706. The EEOC also filed an amended complaint on August 20, 2009.

Since that time, the Court has denied both the *Serrano* and *Avalos* plaintiffs' motions for class action certification [*see* Doc. No. 627] - and the Sixth Circuit has denied motions for interlocutory appeal. [*See* Doc. Nos. 632, 633]. All individual plaintiffs in the *Avalos* matter have had their cases either dismissed, settled, or otherwise resolved [*see* Case No. 06-12311, Doc. No. 647], as is also the case with all plaintiffs in the *Serrano* matter save for Mirna E.

Serrano herself.[2] [*See* Doc. Nos. 712, 722, 732]. Practically speaking, therefore, all that remains of the *Serrano* and *Avalos* matters is the EEOC's § 706 claims against Cintas.

On October 21, 2009, Cintas filed its motion [Doc. No. 662] seeking to preclude the EEOC from proceeding under the "pattern or practice" framework announced by the U.S. Supreme Court in *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). In opposition to that motion, the EEOC argued that it was entitled to pursue a "pattern or practice" action under the *Teamsters* framework - traditionally reserved for § 707 actions - in this action brought under § 706. [*See* Doc. No. 664].

On February 9, 2010, the Court granted Cintas' motion [Doc. No. 662], holding that the EEOC was precluded from advancing its § 706 claims against Cintas under the "pattern or practice" framework announced by the U.S. Supreme Court in *Teamsters*, but instead must proceed under the framework in *McDonnell-Douglas Corp. v. Green*, 422 U.S. 792 (1973). [*See* Doc. No. 723, p.21]. The Court denied the EEOC's motion to certify the issue for interlocutory appeal [*see* Doc. No. 752], and then subsequently denied the EEOC's second motion to amend the complaint to add a "pattern or practice" cause of action under § 707. [*See* Doc. No. 829].

The EEOC was required to disclose the names of all individuals upon whose behalf it was bringing this § 706 suit against Cintas no later than March 23, 2010. [*See* Doc. No. 735, p.16]. Though forty-six females were initially listed by the EEOC as having claims in this action, that number has since been pared to thirteen individual females - one of whom is Lori Schelske, the subject of this motion - who applied for an SSR position with Cintas at its Walker, Michigan

_____

[2] Cintas' motion to dismiss the claims of Ms. Serrano [Doc. No. 881] is currently pending before this Court, which is unopposed by Ms. Serrano [Doc. No. 881, p.4] - though the EEOC opposes the Court granting the motion. [*See* Doc. No. 884].

("Location 301") facility in July of 2002.

<u>The SSR Position and SSR Hiring Procedures at Location 301</u>

Cintas' SSR position is a sales and route driver position. Generally speaking, the position requires driving a truck, selling Cintas' goods and services, and servicing current Cintas accounts for laundry, uniforms and linen products. As the Court previously held in the *Avalos* matter:

> SSRs drive trucks and deliver clean uniforms, mats and supplies to specific customers on their assigned routes. . . SSRs must insure that their trucks are properly loaded with the correct uniforms and products to fulfill the needs of specific customers. As they visit each account, they are tasked with increasing sales and maintaining customer satisfaction at the highest possible level.

[Case No. 06-12311, Doc. No. 186, pp.5-6].

For Location 301, the application process was overseen by the facility's General Manager, Mr. Bryan Houck. Ms. Diane Dykstra, the HR Manager for Location 301, described the hiring process at Location 301 in her deposition [Def.'s Ex. 5, Doc. No. 852]. The hiring process at the time Ms. Schelske applied generally consisted of application screening and - if the screening manager advanced an applicant in the process - one or more interviews. *Id*. at 8-9. The interview process usually began with an initial screening interview consisting of standard, pre-set questions, and was conducted by HR. *Id*. at 16, 51. Continuing candidates would then advance to a series of additional, in-depth interviews with Location 301 service managers. *Id*. at 23. Next, an applicant would usually participate in a "ride along," shift with a current SSR, giving the candidate an opportunity to see the SSR job first hand. *Id*. at 9. Mr. Houck - the General Manager - would then usually conduct a final interview with the applicant following completion of the ride along. [Houck Dep., Def.'s Ex. 6, Doc. No. 852, p.18].

Again, the initial screening of candidate resumes was normally conducted by HR. [Houck

Dep., pp.16, 51]. To determine which applicants would receive an initial screening interview, Ms. Dykstra testified that she would consider factors such as:

> . . . their work history, the type of position that they had worked. If there were some - if we thought that there might be similar attributes to the job that they did before, and the job they were interviewing for. *Income compatibility*, and the number of positions that they held previously over a three-year or five-year period of time.

*Id*. at 11-12 (emphasis added). Ms. Dykstra later emphasized in her deposition that prior work history and income compatibility were "the two most prominent items" upon which Ms. Dykstra determined whether to invite an applicant for a screening interview. *Id*. at 50-51.

At all times relevant to this litigation, Cintas had in effect a company-wide policy prohibiting unlawful discrimination on the basis of gender in hiring and other employment-related actions. [*See* Case No. 06-12311, Doc. No. 632, pp.3-4].

Lori Schelske

Ms. Schelske was not involved in this litigation until the EEOC sent her a solicitation letter in October of 2009. [Schelske Dep., Def.'s Ex. 4, Doc. No. 852, p.23]. Ms. Schelske saw an SSR job posting on a career website - Monster.com - on July10, 2002. *Id*. at 111. She elaborated as follows in her deposition:

> Q: Okay. So you're job hunting in July of 2002; correct?
> A: Yes.
> Q: And you saw a posting on Monster for a Cintas job?
> A: Yes.
> Q: And how does it work? Do you submit a profile or a resume or something online?
> A: Yes.
> Q: And that's what you did?
> A: Yes.
> *****
> Q: When you submitted your application through Monster, did you attach a

|     | resume? |
| --- | --- |
| A: | Yes. |
| Q: | How does it work?  Do you attach it as like a Word file or do you just fill in the blanks in some sort of form? |
| A: | I believe I filled in the blanks. |

[Schelske Dep., pp.15, 22-23].  Ms. Schelske did not, however, receive an invitation from Location 301 to participate in an initial screening interview - and ultimately, therefore, was not hired by Location 301.  *Id*. at 15-16.  Further, without disputing that Ms. Schelske submitted the July 2002 resume, Cintas argues that "[n]ot one Cintas manager or employee has testified in this case that he or she recalls Ms. Schelske's resume.  There is, in fact, no evidence that anyone at Cintas actually reviewed Ms. Schelske's resume."  [Def.'s Br., Doc. No. 852, p.5].

Ms. Schelske's July 2002 resume submitted to Location 301 [Def.'s Ex. 7-A, Doc. No. 852] shows that she completed her GED in 1996.  Her employment history shows stable employment from 1985 until the time she applied with Cintas in 2002, and also shows a wealth of customer service and management experience.  Specifically, Ms. Schelske began as a cashier at Burger King in 1985, progressing to a position as a closing manager with Burger King in only two years time.  *Id*.

Ms. Schelske left Burger King later that year - 1987 - for a position with WESCO, Inc. as a cashier.  She received several promotions involving increased responsibility while at WESCO - being promoted to an assistant manager's position in 1989, and another promotion to store manager in 1990, where she remained for six years until she was promoted a third time to the position of regional operations supervisor in 1996.  Ms. Schelske remained in that position for the six years following that promotion until her application with Location 301 in 2002.

At the time Ms. Schleske applied for an SSR position with Location 301, Mr. Edward

McDonald - a service manager at Location 301 - stated that the typical starting salary for a new SSR ranged between $30,000 to $35,000. [*See* McDonald Decl., Def.'s Ex. 7, Doc. No. 852, ¶8]. On her application, however, Ms. Schelske stated that her salary requirements were $55,000 - almost double the low end of the typical SSR starting salary. [Schelske Resume, Def.'s Ex. 7-A, Doc. No. 852]. While Ms. Schelske testified at her deposition that she intended the $55,000 as merely the starting point of salary negotiations, she also admitted that it would be reasonable for someone reviewing her application to assume that the $55,000 was a hard and fast requirement:

> Q:   So would it be fair to say that you were looking for a job that made approximately $55,000 a year?
> A:   No.
> Q:   Okay, can you explain that to me?
> A:   You always want to go big.
> Q:   Okay.
> A:   And you can take less. Obviously I did.
> Q:   Okay. But when this says salary requirements not salary wishes, do you think its reasonable for someone who was reviewing this to think that you would require $55,000 a year?
> A:   I don't know if I put the requirements or if it was one of - - on the application, if that's their verbiage, so I guess. I didn't look at it that way.
> Q:   Okay.
> A:   But I - - say your question.
> Q:   You agree that's reasonable? Would it be reasonable for someone who was reviewing this application to read this and think that you required a salary of $55,000 a year?
> A:   I agree.

[Schelske Dep., Def.'s Ex. 4, Doc. No. 852, pp.111-112]. Further, Ms. Schelske testified that, in the years that preceded her Location 301 application, her income was significantly higher than the average SSR starting salary:

> Q:   Okay, if you could turn to the second page, which looks to me like some sort of Social Security statement; would you agree with that?
> A:   Yes.
> Q:   And if you look in the years '98, '99, and 2000 would you agree with me

|      |                                                                 |
|------|-----------------------------------------------------------------|
|      | that in all of those years you made over $50,000?               |
| A:   | Yes.                                                            |
| Q:   | And in 1999 you actually made over $60,000; correct?            |
| A:   | Yes.                                                            |
| Q:   | And then 2001 you made $48,000; correct? Approximately?         |
| A:   | Yes.                                                            |
| Q:   | In 2002 you made still over $34,000; correct?                   |
| A:   | Yes.                                                            |
| Q:   | And that was the year that you left Wesco in July?              |
| A:   | Yes.                                                            |

*Id*. at 138-39.

Ultimately, Location 301 did not interview Ms. Schelske for an SSR position, and Ms. Schelske never contacted Cintas to follow up about her resume. *Id*. at 15-16. Ms. Schelske is unaware of any facts that would lead her to believe that Cintas discriminated against her on the basis of her gender:

|      |                                                                 |
|------|-----------------------------------------------------------------|
| Q:   | Okay. Do you think that Cintas discriminated against you on the basis of your gender? |
| A:   | I don't know that.                                              |
| Q:   | Okay. At the time you didn't receive the job in July of 2002, did you think at that time that you didn't receive the job because you're a woman? |
| A:   | At that time I didn't know why I didn't.                        |
|      | *****                                                           |
| Q:   | Prior to receiving the letter from the EEOC in October of 2009, did you believe that Cintas didn't hire you because of your gender? |
| A:   | No.                                                            |

*Id*. at pp.29, 202.

<u>Cintas' Instant Motion for Summary Judgment</u>

Following the close of discovery in this action, Cintas filed this motion for summary judgment [Doc. No. 852] on July 14, 2010. In this motion, Cintas argues that the EEOC's claims

on behalf of Ms. Schelske fail on their merits as a matter of law.[3]  The EEOC opposes Cintas'

motion. [Doc. No. 896].  The matter is now ripe for decision by the Court.

STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c)(2).  The party

seeking summary judgment has the initial burden of informing the court of the basis for its

motion and identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file together with the affidavits which demonstrate the absence of a genuine

issue of material fact.  *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to

the nonmoving party who "must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

ANALYSIS

In its instant motion [Doc. No. 852], Cintas argues that the EEOC's suit on behalf of Ms.

Schelske should be dismissed for three reasons: 1) because Ms. Schelske was not "qualified" for

an SSR position and therefore cannot advance a *prima facie* case of discrimination; 2) because

the EEOC cannot demonstrate that Cintas' decisions not to hire Ms. Schelske was a pretext for

gender discrimination; and 3) because Ms. Schelske's prior bankruptcy filings preclude recovery

---

[3] In addition to summary judgment motions attacking the merits of each of EEOC's thirteen individually-named plaintiffs, Cintas has also filed an omnibus motion attacking each of these named plaintiffs for procedural reasons - namely, the EEOC's failure to exhaust administrative remedies before filing this lawsuit. [*See* Doc. No. 836].  Notwithstanding the EEOC's arguments to the contrary [*see* EEOC's Br., Doc. No. 896, p.1, n1], the Court will address the merits of Ms. Schelske's claims in this order, and will address the EEOC's alleged failure to exhaust administrative remedies on all named plaintiffs in a separate order.

by the EEOC in this matter.  While the Court disagrees with the first of these arguments, the Court agrees that the EEOC cannot demonstrate the pretextual nature of Cintas' failure to hire Ms. Schelske.  Dismissal of the EEOC's claims on behalf of Ms. Schelske is therefore proper.[4]

Section 706 permits the EEOC to sue a private employer on behalf of a "person or persons aggrieved" by an employer's unlawful employment practice.  42 U.S.C. § 2000e-5(f)(1).  The EEOC is "master of its own case" when bringing suits on behalf of aggrieved persons in a § 706 lawsuit, and may bring such suits with or without the consent of the aggrieved persons. *EEOC v. Waffle House*, 534 U.S. 279, 291-92 (2002).  "Nonetheless, it is axiomatic that the EEOC stands in the shoes of those aggrieved persons in the sense that it must prove all the elements of their [discrimination] claims to obtain individual relief for them." *EEOC v. CRST Van Expedited, Inc.*, 611 F.Supp.2d 918, 929 (N.D. Iowa 2009).

Absent evidence of intentional discrimination, the EEOC must pursue § 706 claims brought on behalf of aggrieved individuals under the familiar burden-shifting scheme outlined in *McDonnell-Douglas Corp. v. Green*, 422 U.S. 792 (1973). *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760 (4th Cir. 1998); *see also Serrano v. Cintas Corp.*, - - F.Supp.2d. - -, 2010 WL 522846 (E.D. Mich. Feb. 9, 2010).  Under the *McDonnell-Douglas* framework, plaintiffs must first establish a *prima facie* case of discrimination. *McDonnell-Douglas*, 422 U.S. at 802.  Once the plaintiff has established such a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id*.  If the employer articulates such a legitimate, nondiscriminatory reason, the plaintiff bears the

---

[4] As dismissal of the EEOC's claims on behalf of Ms. Schelske is warranted on *McDonnell-Douglas* grounds, the Court declines to reach Cintas' alternate argument regarding Ms. Schelske's prior bankruptcy filings.

burden of proving that the employer's articulated reason is a pretext for discrimination.  *Id*.  The Court will consider each of these issues in turn.

I.  The EEOC's *Prima Facie* Case on Behalf of Ms. Schelske.

To establish a *prima facie* case of discriminatory hiring practices, a plaintiff without direct evidence of discrimination must show that 1) she belonged to a protected class; 2) she applied and was qualified for a job for which the employer was seeking applicants; 3) despite her qualifications, she was rejected; and 4) after her rejection, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications.  *See McDonnell-Douglas*, 411 U.S. at 802.  In this case, Cintas only disputes the second of these requirements with respect to Ms. Schelske's July 2002 application: that Ms. Schelske was not "qualified" for an SSR position due to her $55,000 salary requirment.  The Court, however, disagrees.

In *Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003), the Sixth Circuit elaborated on the requirements of the "qualified" element of a *prima facie* discrimination claim. The *Wexler* Court held that, "[a]t the prima facie state, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job."  *Wexler*, 317 F.3d at 575 (emphasis in original).  To meet this burden, plaintiffs need only "present[] credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field."  *Id*. at 576.  The Sixth Circuit elaborates as follows:

> Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrating possession of the required skills.

*Wexler*, 317 F.3d at 576.

In support of its argument that Ms. Schelske was not "qualified" for a position with Location 301, Cintas argues as follows:

> Salary compatibility was a requirement for SSRs at Location 301. Salary compatibility was not only a factor. . .[,] it was one of the *two most important factors* (along with work history) that Location 301 managers used in screening applications. Ms. Schelske's required salary of $55,000 was significantly higher than the typical SSR starting salary of $30.000-$35,000. Therefore, she would not have been considered for an SSR position, and she was not qualified for that position. .

[Def.'s Br., Doc. No. 882, pp. 11-12 (internal citations omitted) (emphasis in original)].

While it may be true that Location 301 would not have *ultimately hired* Ms. Schelske due to her desire for $55,000 in salary, the facts of this case do not warrant a finding that this desire somehow renders her "unqualified" for an SSR position. Even if, *arguendo*, such a disparity between what an applicant and an employer are prepared to accept regarding starting salary *could* conceivably render one "unqualified" for a position - a position this Court emphatically does not agree with - that scenario is not presented in the facts of this case. Here, in the light most favorable to the EEOC, Ms. Schelske testified at her deposition that she only considered the $55,000 as a starting point for salary negotiations, and that *she would have been willing to accept less*. [Schelske Dep., pp.111-12].

On the facts presented, the Court finds Ms. Schelske qualified for an SSR position for purposes of prong one of the *McDonnell-Douglas* inquiry, and Cintas' arguments to the contrary are without merit. Therefore, the Court will move on to consider the second prong of the *McDonnell-Douglas* inquiry - Cintas' legitimate, nondiscriminatory rationale for not hiring Ms. Schelske.

II. Cintas' Legitimate, Nondiscriminatory Rationale for Not Hiring Ms. Schelske.

In its motion for summary judgment, Cintas argues that it has pointed to legitimate, nondiscriminatory reasons for why it did not hire Ms. Schelske. Specifically, Cintas' rationale regarding Ms. Schelske's July 2002 application is as follows:

> Even if the EEOC could make a *prima facie* showing of discrimination, the fact that her salary "requirements" were well above the salary paid to SSRs is still a compelling, legitimate and non-discriminatory reason for why it did not hire Ms. Schelske.

[Def.'s Br., Doc. No. 852, p.12 (internal quotation omitted)]. In its brief in opposition to Cintas' motion [Doc. No. 896], the EEOC's argument against Cintas' legitimate, nondiscriminatory rationale is as follows:

> Cintas also fails in its attempt to use income compatibility as its legitimate reason for failing to hire Ms. Schelske. As an initial matter, neither Ms. Dykstra nor anyone else identified by Cintas has been able to testify to the exact reason Ms. Schelske was passed over for a position. Therefore, any attempts to now provide a nondiscriminatory reason why Ms. Schelske was not hired have no basis in fact and are not reasons within the meaning of the law, but mere post hoc justifications of Cintas actions.

[EEOC's Br., Doc. No. 896, p.12 (footnoted material and internal citation omitted)].

This argument, however, is unavailing. On the facts of this case, there is nothing wrong with Cintas's proffered argument advancing reasons why *it would not have interviewed Ms. Schelske*. The EEOC offers no authority for its proposition that employers cannot offer rationales for why they would not have hired an applicant when no managerial employee specifically remembers reviewing that candidate's application. Indeed, Ms. Schelske herself stated at her deposition that, though she did not intend to give the impression that she would work for no less than $55,000 in salary, she agreed that it would be reasonable for someone

13

reviewing her application to think this *was* her requirement. [Schelske Dep., pp.111-12].

For purposes of this motion, therefore, the Court holds that Cintas' proffered rationale for not hiring Ms. Schelske is legitimate and nondiscriminatory, and the EEOC's arguments to the contrary are without merit   Thus, the Court will consider the third and final prong of the *McDonnell-Douglas* inquiry - the EEOC's ability to demonstrate that Cintas' rationale for not hiring Ms. Schelske was a pretext for gender discrimination.

III.  <u>The EEOC's Case for Pretext</u>.

Cintas argues that the EEOC is unable to demonstrate that Cintas' asserted reason for not hiring Ms. Schelske is pretextual.  [Def.'s Br., Doc. No. 852, pp. 12-13].  The Court agrees, and therefore **GRANTS** Cintas' motion for summary judgment [Doc. No. 852].

The Sixth Circuit has held that pretext can be shown:

> . . . in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's decision.

*Chen v. Dow Chemical Corp.*, 580 F.3d 394, 400 (6th Cir. 2009), citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004).  To carry its burden in opposing summary judgment, the EEOC must produce sufficient evidence from which a jury could reasonably reject Cintas' explanation of why it chose not to hire Ms. Schelske.  *Id*.  Further, it is not sufficient for the EEOC to simply allege fact questions regarding the pretextual nature of Cintas' actions.  "A defendant's proffered reason cannot be proved to be a pretext 'unless it is shown *both* that the reason was false *and* that discrimination was the real reason.'" *Harris v. Metro. Gov't of Nashville and Davidson County, Tennessee*, 594 F.3d 476, 486 (6th Cir. 2010), citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (quotations and emphasis in original).

The EEOC relies primarily upon statistical and anecdotal evidence of discrimination in an attempt to rebut as pretextual Cintas' decision not to hire Ms. Schelske.  Relevant to this case, the EEOC argues that when a plaintiff offers:

> . . . other probative evidence of discrimination, that evidence, taken together with the evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment.

[EEOC's Br., Doc. No. 896, pp.14-15, quoting *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 392 (6th Cir. 2009), citing *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 626-27 (6th Cir. 2006)].

Here, however, the EEOC fails to even discuss Ms. Schelske's qualifications relative to those of any other applicant hired by Location 301.  Rather, all the EEOC argues is that other individuals that put salary requirements above the $30,000 to $35,000 range may still have been advanced in the interview process.  This evidence, coupled with the statistical evidence proffered, the EEOC argues, is sufficient to rebut Cintas' rationale as pretextual. [EEOC's Br., Doc. No. 896, p.15].  The Court disagrees.

In *Risch*, the Sixth Circuit considered the claims of a female police officer who was allegedly passed over for a detective position with her police department because she was a woman.  *Risch*, 581 F.3d at 385.  The police department passed over her "in favor of two male applicants who had lower scores than Risch under the promotion system used by the Department."  *Id*.  The "other probative evidence" relied upon in *Risch* was explained as follows:

> The record also contains other evidence probative of pretext.  The record indicates that male officers frequently made degrading comments regarding the capabilities of female officers, expressed the view that female officers would never be promoted to command positions, and made generally degrading remarks about

women.

*Risch*, 581 F.3d at 392. These statements, the Sixth Circuit held, "evidence a discriminatory atmosphere in the Department in which male officers frequently made derogatory or discriminatory remarks about female officers." *Id*. at 393. Thus, the Sixth Circuit held, the plaintiff in *Risch* had presented enough evidence to survive summary judgment:

> In light of the above evidence of a discriminatory atmosphere in the Department, the lack of women in command positions at the Department, and the evidence that Risch was arguably better qualified than the two male applicants promoted in 2005, we conclude that Risch has produced sufficient evidence to establish a genuine issue of material fact concerning whether the Department's proffered legitimate, nondiscriminatory reason was pretextual.

*Id*. at 394.

Here, by contrast, the EEOC's "other evidence" is limited to the statistical analysis of Dr. Thomas DiPrete. [*See* EEOC's Ex. BB, Doc. No. 901]. In his expert report, Dr. DiPrete examined all SSR hirings at Cintas locations in Michigan from 1999 to 2005, and found that, of the 427 SSR hirings in the state of Michigan during that time, only 24 - or approximately 5.6% - were female. [*See* DiPrete Report, EEOC's Ex. BB, Doc. No. 901, p.5; EEOC's Br., Doc. No. 896, p.2]. Based on Dr. DiPrete's analysis, the EEOC goes on to argue as follows:

> Comparing the estimated availability with the females hired, Dr. DiPrete noted a pattern of under hiring that was statistically significant beyond the threshold of two standard deviations. That is, it is highly unlikely that the pattern of under hiring females at Cintas occurred by chance alone.

[EEOC's Br., Doc. No. 896, p.3]. The Court, however, disagrees.

In *Bowdish v. Continental Accessories, Inc.*, 1992 WL 133022 (6th Cir. June 12, 1992), the Sixth Circuit rejected that plaintiff's attempts to use anecdotal evidence as evidence of discriminatory pretext. The *Bowdish* Court then held that anecdotal or statistical evidence, on its

own, is insufficient to establish pretext:

> . . . such evidence, standing alone, still would not be sufficient to establish a case of individual disparate treatment. An individual plaintiff in an employment discrimination case must present some evidence that demonstrates that his or her individual discharge was the result of discrimination.

*Bowdish*, 1992 WL 133022, *5. Therefore, the EEOC's attempt in this litigation to demonstrate the pretextual nature of Cintas' failure to hire Ms. Schelske by statistical or anecdotal evidence is insufficient. Dr. DiPrete admitted as much at his deposition, when he stated that he could not express any opinion in regards to why any individual named plaintiff may not have been hired. [*See* DiPrete Dep., Def.'s Ex. 3, Doc. No. 911, pp.67-69, 136-37].

Further, the EEOC's attempt to bootstrap a pretext finding based upon cobbled-together anecdotes from individuals commenting on other locations and times than Ms. Schelske's application to Location 301, from statistics relating to the purported hiring patterns of other Cintas locations, and from the concurrently-filed cases of the other twelve named plaintiffs in this matter, each also fail to demonstrate pretext in this matter. "Other location" and "other time" hiring decisions are irrelevant on the question of whether Location 301 refused to hire Ms. Schelske because of her gender. *See, e.g., Davis v. Hammonds*, 103 Fed. Appx. 51, 53 (8th Cir. 2004); *Shaw v. Monroe County*, 1996 WL 426483 (E.D. Mich. Apr. 18, 1996).

Finally, even if statistics alone *could* warrant consideration as evidence of pretext in this matter, the EEOC's statistics are merely "statistics without correlation," which "are indicative of no meaningful inference or conclusion." *Shaw*, 1996 WL 426483, *8, quoting *Long v. City of Saginaw*, 911 F.2d 1192, 1201 (6th Cir. 1990). In *Long*, the Sixth Circuit rejected statistics which purported to show the availability of minority candidates for the Saginaw Police

Department. In that case, the "available labor pool" used to calculate the statistics was held to be *too broad in scope*, because it included all individuals identified as working in "protective services" by the U.S. Census Bureau - a classification that included "bouncers, camp guards, school-crossing guards, meter maids. . . life guards, dog catchers, [and] bodyguards[,]" to name but a few examples. *Long*, 911 F.2d at 1200.

Here, by contrast, the EEOC's statistical analysis by Dr. DiPrete is even broader than the available labor pool utilized in *Long* - it includes census labor groupings such as human resource managers, computer support specialists, clergy, elementary and middle school teachers, artists, cooks, counter attendants and convenience store clerks, receptionists, and office clerks within its calculations of the available labor pool. While the EEOC vigorously disputes the propriety of basing the available labor pool for SSR positions on a single census occupation code - 913, relating to driver/sales workers and truck drivers [*see* Doc. No. 833, pp.12-17] - *clearly* the EEOC's own statistics draw from far too broad an available labor pool - and thus overly inflate female availability for SSR positions. For these reasons, the EEOC has not proffered the type of "other probative evidence" discussed in *Risch* as sufficient to survive summary judgment.

Again, save for the EEOC's statistical evidence proffered by Dr. DiPrete, the EEOC's sole evidence to demonstrate pretext on behalf of Ms. Schelske is limited to the argument that other individuals may have received interviews with Location 301 despite their stated income requirements being higher than Cintas' normal starting salary range:

> . . . numerous men have been hired [by Cintas] despite either not stating an expected income while at the same time having employment histories which could indicate that their expected salaries could be higher than the starting salary offered to Cintas SSRs, or stating expected incomes far in excess of the starting salary for an entry level SSR[.]

[EEOC's Br., Doc. No. 896, p.15]. While potentially true, the Court disagrees with the EEOC's overall argument. As the Sixth Circuit commented in *Bender v. Hecht's Dept. Stores*, 455 F.3d 612 (6th Cir. 2006):

> Of course, acknowledging that evidence of comparative qualifications may be probative of pretext is a far cry from holding that such evidence is itself sufficient in all cases to raise a genuine issue of fact of discriminatory motive. For we need to balance the Supreme Court's statement in *Burdine* [that qualifications evidence may be probative of whether the employer's reasons are pretexts for discrimination] with the principles that employers are generally free to choose among qualified candidates, and that the law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. . . a rejected applicant must show that a reasonable jury could conclude that the actual reasons offered by the defendant were a mere pretext for unlawful []discrimination, not that other reasonable decision-makers might have retained the plaintiff.

*Bender*, 455 F.3d at 626 (internal citations and quotations omitted). The *Bender* Court went on to hold as follows:

> On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be *so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former*. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of material fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

*Bender*, 455 F.3d at 627 (emphasis added).

The EEOC has failed to demonstrate that Ms. Schelske's qualifications were "so significantly better" than those of any applicant hired instead of her that "no reasonable employer would have chosen the latter applicant[s] over the former." *Bender*, 455 F.3d at 627. Indeed, the EEOC's brief [Doc. No. 896] does not even include a specific argument against any of the

applicants that ultimately may have received interviews around the same time as Ms. Schelske applied to Location 301 in July of 2002.

True, when viewed in the light most favorable to the EEOC's claims on behalf of Ms. Schelske, perhaps many of the elements of her relevant experience would have looked more favorable than those of other applicants. But to allow these type of side-by-side comparisons of Ms. Schelske's qualifications to those of successful applicants - absent other probative evidence of discrimination - would, in the words of the *Bender* Court:

> . . . move this court from its proper role of preventing unlawful employment practices to the illegitimate role of acting as a "super personnel department," overseeing and second-guessing employers' business decisions.

*Bender*, 455 F.3d at 628, quoting *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983).

Even assuming that the EEOC could show that Cintas' purportedly legitimate, nondiscriminatory reason for not hiring Ms. Schelske was pretextual, the EEOC has failed to offer any evidence raising a genuine issue of material fact that this reason was a pretext for gender discrimination. This evidentiary failure is fatal to the EEOC's claim on behalf of Ms. Schelske in this litigation, and summary judgment in Cintas' favor is therefore proper. The EEOC's arguments to the contrary are without merit.

CONCLUSION

For the reasons explained above, the Court **GRANTS** Cintas' motion for summary judgment [Doc. No. 852], and **DISMISSES WITH PREJUDICE** the EEOC's claim brought on

behalf of Ms. Schelske.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  September 9, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 9, 2010, by electronic and/or ordinary mail.

s/Jennifer Hernandez
Case Manager