UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
                               Case Nos. 04-40132; 06-12311

       Plaintiff- Intervenor          HONORABLE SEAN F. COX
                               United States District Judge

v.

CINTAS CORPORATION,

       Defendant.

_____/

## OPINION & ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT re: KARI DENBY KREMHELMER [Doc. No. 864]

On December 23, 2005, the Equal Employment Opportunity Commission ("EEOC") filed

complaints as an intervening plaintiff in two cases that were consolidated for pretrial purposes -

*Mirna E. Serrano, et al. v. Cintas Corp.* [Case No. 04-40132]; and *Blanca Nelly Avalos, et al. v.*

*Cintas Corp.* [Case No. 06-12311] - alleging that Defendant Cintas Corporation ("Cintas")

engaged in discriminatory hiring practices against female applicants in violation of 42 U.S.C. §

2000e-5, also known as a "Section 706" action.[1]  In March of 2010, the EEOC identified Ms.

Kari Denby Kremhelmer ("Kremhelmer") as one of thirteen individuals upon whose behalf the

EEOC brought this § 706 action.  The matter is before the Court on Cintas' motion for summary

judgment [Doc. No. 864] with respect to Ms. Kremhelmer's claims.  The parties have fully

briefed the issues, and the Court declines to hear oral argument pursuant to E.D. MICH. L.R.

_____

[1] For ease of reference, all further citations to document numbers in this motion will refer to the
04-40132 case unless otherwise noted.

7.1(f)(2).  For the reasons that follow, the Court **GRANTS** Cintas' motion [Doc. No. 864], and

**DISMISSES WITH PREJUDICE** the EEOC's claim brought on behalf of Ms. Kremhelmer.

BACKGROUND

These causes of action have already suffered through a long, complex factual and

procedural history - a history already discussed by the Court in previous orders.  Therefore, only

those facts of particular relevance to the instant motion are included below.

Background to this Litigation

The individual plaintiffs in the *Serrano* action filed their original charge of discrimination

with the EEOC on or about April 7, 2000 - over a decade ago. [*See Serrano* Complaint, Doc. No.

1, ¶7].  Two years later, in June of 2002 - the EEOC issued a determination that reasonable cause

existed to believe Cintas had engaged in discriminatory hiring practices. [*See* Doc. No. 1, Ex. A].

After two more years, in May of 2004, the EEOC formally declined to issue a right to sue letter -

at which time the *Serrano* individual plaintiffs filed their lawsuit in this action.  *Id*.

Roughly a year and a half after that - on December 23, 2005 - the EEOC filed suit as an

intervening plaintiff in this action. [*See* Doc. No. 98].  The EEOC's first complaint brought

actions under §§ 705 and 706.  The EEOC also filed an amended complaint on August 20, 2009.

Since that time, the Court has denied both the *Serrano* and *Avalos* plaintiffs' motions for

class-action certification [*see* Doc. No. 627] - and the Sixth Circuit has denied motions for

interlocutory appeal. [*See* Doc. Nos. 632, 633].  All individual plaintiffs in the *Avalos* matter

have had their cases either dismissed, settled, or otherwise resolved [*see* Case No. 06-12311,

Doc. No. 647], as is also the case with all plaintiffs in the *Serrano* matter save for Mirna E.

Serrano herself.[2] [*See* Doc. Nos. 712, 722, 732].  Practically speaking, therefore, all that remains of the *Serrano* and *Avalos* matters is the EEOC's § 706 claims against Cintas.

On October 21, 2009, Cintas filed its motion [Doc. No. 662] seeking to preclude the EEOC from proceeding under the "pattern or practice" framework announced by the U.S. Supreme Court in *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977).  In opposition to that motion, the EEOC argued that it was entitled to pursue a "pattern or practice" action under the *Teamsters* framework - traditionally reserved for § 707 actions - in this action brought under  § 706. [*See* Doc. No. 664].

On February 9, 2010, the Court granted Cintas' motion [Doc. No. 662], holding that the EEOC was precluded from advancing its § 706 claims against Cintas under the "pattern or practice" framework announced by the U.S. Supreme Court in *Teamsters*, but instead must proceed under the framework in *McDonnell-Douglas Corp. v. Green*, 422 U.S. 792 (1973).  [*See* Doc. No. 723, p.21].  The Court denied the EEOC's motion to certify the issue for interlocutory appeal [*see* Doc. No. 752], and then subsequently denied the EEOC's second motion to amend the complaint to add a "pattern or practice" cause of action under § 707. [*See* Doc. No. 829].

The EEOC was required to disclose the names of all individuals upon whose behalf it was bringing this § 706 suit against Cintas no later than March 23, 2010. [*See* Doc. No. 735, p.16].  Though forty-six females were initially listed by the EEOC as having claims in this action, that number has since been pared to thirteen individual females - one of whom is Kari Kremhelmer, the subject of this motion - who applied for an SSR position with Cintas at its Madison Heights,

---

[2] Cintas' motion to dismiss the claims of Ms. Serrano [Doc. No. 881] is currently pending before this Court, which is unopposed by Ms. Serrano [Doc. No. 881, p.4] - though the EEOC opposes the Court granting the motion. [*See* Doc. No. 884].

Michigan ("Location 31") facility in January of 2001, and again at Cintas' Macomb, Michigan ("Location 354") facility in June of 2002. In this litigation, however, the EEOC has elected to not pursue a § 706 claim on behalf of Ms. Kremhelmer in relation to her 2002 application to Location 354. [*See* EEOC's Br. Doc. No. 887, p.4 n6 ("The EEOC is not alleging a claim for Kremhelmer under the McDonald Douglas framework in regard to an application submitted in 2002 at Location 354")].

The SSR Position and SSR Hiring Procedures at Location 31

Cintas' SSR position is a sales and route driver position. Generally speaking, the position requires driving a truck, selling Cintas' goods and services, and servicing current Cintas accounts for laundry, uniforms and linen products. As the Court previously held in the *Avalos* matter:

> SSRs drive trucks and deliver clean uniforms, mats and supplies to specific customers on their assigned routes. . . SSRs must insure that their trucks are properly loaded with the correct uniforms and products to fulfill the needs of specific customers. As they visit each account, they are tasked with increasing sales and maintaining customer satisfaction at the highest possible level.

[Case No. 06-12311, Doc. No. 186, pp.5-6]. Though policies and procedures for each Cintas location are set by Cintas' corporate headquarters, each Cintas location engages in a decentralized hiring process for SSR applicants - in other words, each Cintas location hires its own SSRs.

At all times relevant to this motion, Ms. Holly Woonton served as the Human Resources Manager for several Cintas facilities in Michigan, including Location 31. [*See* Woonton Dep., Def.'s Ex. 6, Doc. No. 859, p.8]. It was Ms. Woonton's responsibility, as HR Manager, to review and screen SSR applications and resumes. *Id*. at 10. When screening applicants, Ms. Woonton would:

> . . . see what their employment looked like, what type of experiences they had. Again. . . how many positions they had, reasons for leaving, and whether or not they had customer service or sales experience.

*Id*. at 19. Further, Mr. Robert Ferraro , the General Manager at Location 31 from January 2000 to June 2002, agreed that Cintas preferred candidates who demonstrated successful sales experience, customer service, and the ability to work without supervision. [Ferraro Dep., Def.'s Ex. 8, Doc. No. 859, p.8].

Preferring applicants with a stable job history, Ms. Woonton would examine an SSR applicant's background for their experience and to determine any significant gaps in employment. [Woonton Dep., p.15]. Honesty was considered by Cintas to be a quality needed in all successful SSR applicants [Woonton Decl., Def.'s Ex. 9, Doc. No. 859, ¶¶10-11] - a fact previously noted by the Court in prior opinions in this litigation. [*See* Doc. No. 511, p.4]. Having a college degree was a plus for an SSR candidate's application, as well as was a referral from a current Cintas employee. [Woonton Dep., p.35].

Candidates that advanced beyond the resume and application screen would be given a brief phone screening interview - usually with Ms. Woonton. *Id* at 21. Continuing applicants would then have an in-person interview, and if advanced further in the process, would likely have additional interviews with Location 31 service managers. If still deemed a viable candidate, SSR applicants would then participate in a route ride-along with a current SSR - giving the SSR applicant an opportunity to see the job in action, as well as allowing the current SSR to evaluate the applicant on the job. [Ferraro Dep., p.33]. After the ride-along, SSR applicants would have a final interview with Mr. Ferraro, Location 31's General Manager.

Following these interviews, all those involved in the hiring process - including the SSR

who accompanied the applicant on the ride-along - would engage in an information exchange where the candidate's qualifications were considered. *Id*. Following this information exchange, the General Manager would make the final hiring decision - pending, for successful candidates, a drug screen, driving records check, background check, and consultation of references. *Id*. at 34.

The EEOC offers anecdotal evidence in an attempt to cast Location 31 as being against the hiring of female SSRs. Most of this evidence, however, deals with other Cintas locations besides Location 31, or was in times other than when Mr. Kremhelmer applied - or both.

For instance, the EEOC highlights the deposition testimony of Gehan Haridy, a former HR trainee and HR manager at Location 31, who stated that "[i]t was glaringly obvious that there were more men than women" in the SSR positions. [Haridy Dep., EEOC's Ex. D, Doc. No. 887, p.25]. What the EEOC does not state, however, is that Mr. Haridy's answer quoted *supra* was in response to a question regarding whether *Cintas was trying to improve its ratio of female SSR hires* - to which he responded affirmatively. *Id*. Further, Mr. Haridy also testified that *he was not employed by Cintas until after Ms. Kremhelmer applied* with Location 31. *Id*. at 5.

Similarly, the EEOC highlights the deposition testimony of Mr. Roger Farver - a former SSR at Location 31 when Ms. Kremhelmer applied. Mr. Farver testified that he overheard someone at Cintas state that the SSR position was a "man's job," and that he himself did not think nine out of ten women could do the job. [Farver Dep., EEOC's Ex. E, Doc. No. 887, p.22]. Aside from his own personal opinion on the subject, Mr. Farver also stated that the "man's job" comment *did not even occur at Location 31*, but instead was made while he worked at a Cintas facility in Midland, Michigan. *Id*.

Finally, the EEOC highlights the deposition testimony of Ms. Jennifer Burgess, who

applied at Location 31 for an SSR position - but that it was the year prior to Ms. Kremhelmer's application. Ms. Burgess stated that, when interviewed by a male at Location 31, the interviewer expressed doubt as to her ability to handle the physical aspects of the SSR position, and that "he was looking for a man to fill the position." [Burgess Dep., EEOC's Ex. F, Doc. No. 887, pp.29-30]. Again, however, Ms. Burgess applied at Location 31 the year prior to Ms. Kremhelmer.

Kari Denby Kremhelmer

Ms. Kremhelmer was not involved in this litigation until the EEOC sent her a solicitation letter sometime in October of 2009. [Kremhelmer Dep., Def.'s Ex. 4, Doc. No. 864, pp.55, 96-96]. Ms. Kremhelmer saw a billboard advertising SSR position openings at Location 31, and filled out an application on January 4, 2001.[3] [See Def.'s Ex. 7-A, Doc. No. 864]. Ms. Kremhelmer gave the following overview of her application experience with Location 31:

> I recall going in. I saw - - there was a billboard on Dequindre Road that said they were hiring route sales drivers. I went in. I filled out an application and turn it in and a week or so later I got a call to go in and I had an interview. And I also took some sort of test. It was like an aptitude test, I want to say. And that was it for then. And a couple of weeks later, I think it was, I received a letter from Cintas saying that they were not hiring me.

[Kremhelmer Dep., p56].

The application that Ms. Kremhelmer filled out contained the following certification, to which Ms. Kremhelmer agreed as indicated by her signature:

> The information contained in this application is true to the best of my knowledge and belief, and I understand and agree that any misrepresentation or false or incomplete statement by me in connection with the application will constitute

---

[3] Since the time of her 2001 application, Ms. Kremhelmer married and took her husband's last name - she was known as Kari Anne Denby at the time of her January 4, 2001 application with Location 354. Consistent with the briefing filed by both parties to this motion, however, the Court will refer to the named plaintiff as Ms. Kremhelmer for purposes of this motion.

justifiable cause for Cintas not to employ me or, if employed, to terminate my employment at any time.

[Def.'s Ex. 7-A, Doc. No. 864]. Despite this certification, however, Ms. Kremhelmer's January 2001 application with Location 31 contained several representations that, by any measure, were less than forthright.[4]

As instructed on her application, Ms. Kremhelmer represented her prior employment history for "at least 7 years." [Def.'s Ex. 7-A, Doc. No. 864]. From April 1995 to August 1997 - a period partially encompassing her high school years - Ms. Kremhelmer worked as a janitor for Stat Cleaning. *Id*. When that company went out of business, Ms. Kremhelmer then took a position as a driver for Specmo Enterprises, which employed her from September 1997 until she left to seek a better paying position in January of 2000. *Id*. While at Specmo, Ms. Kremhelmer stated that her job was to drive to auto dealerships in southeast Michigan and pick up or drop off delco radios. *Id*. Ms. Kremhelmer then claimed that she worked as a delivery driver for Suburban Floral Delivery - a wholesale flowers distributer - from May 2000 until December of 2000. Ms. Kremhelmer explained her duties in that position as follows:

Q:    What was your job at Suburban Floral?
A:    I was a driver.
Q:    A delivery driver?
A:    Yes.

---

[4] In addition to her employment history discussed *infra*, Cintas also argues that Ms. Kremhelmer inflated her grade point averages for both high school and college. While Ms. Kremhelmer admitted at her deposition that her grade point averages at both educational institutions were lower than what she represented on her January 2001 application, she stated that she honestly thought her grades were in the range she represented. [*See* Kremhelmer Dep., pp.119-20 ("At the time I didn't. I wasn't doing it to mis - - I wasn't trying to mislead")]. In the light most favorable to the EEOC, the Court finds that, while Ms. Kremhelmer's grade point averages listed on her January 2001 resume were not accurate, the inaccuracy is not indicative of an intent by Ms. Kremhelmer to deceive Cintas. The Court will therefore disregard the discrepancy regarding Ms. Kremhelmer's grades for purposes of this opinion.

> Q:     Did you have any duties at Suburban Floral other than delivering[,] I assume it's flowers and plants?
>
> A:     No.
>
> Q:     Those were your only duties?
>
> A:     We picked up - - we picked up the packages from the florist and also delivered wholesale flowers to the florist.

[Kremhelmer Dep., p.70]. Ms. Kremhelmer further admitted that none of the positions she listed

on her January 2001 application included experience in sales or customer service:

> Q:     Did any of the jobs that you included on your Cintas application include sales duties?
>
> A:     No.
>
> Q:     Did any of the jobs that you included on your Cintas application include customer service duties?
>
> A:     No.
>
> Q:     Did you have any prior sales jobs before applying to Cintas?
>
> A:     No.
>
> Q:     Did you have any prior customer service jobs before applying to Cintas?
>
> A:     No.

*Id.* at 136-37.

In reality, despite Ms. Kremhelmer's representation that she left Specmo in January of

2000 to seek a better paying position, Ms. Kremhelmer had been terminated from that position

over a year earlier on October 7, 1999:

> Q:     . . . Specmo indicates that your work with their company terminated on October 7, 1999. Do you now see that the entry you made on the Cintas application about your dates of employment at Specmo was not accurate?
>
> A:     Yes.
>
> Q:     Did you list [an] innacurate date of termination at Specmo because you did not want Cintas to believe that you had a significant gap in employment?
>
> A:     I don't remember. I don't remember why I wrote that down.
>
> Q:     *That may have been the reason, correct?*
>
> A:     *It may have been.*

*Id.* at 117-18 (emphasis added).

Further, Ms. Kremhelmer also admitted at her deposition that she neglected to include

two additional positions in her employment history: one with KDS Controls, which she worked

at for a few weeks in 2000, and another position with Express Services - a temp agency.  Ms.

Kremhelmer discussed her brief employment with KDS Controls in her deposition as follows:

> Q:      Okay.  Why did you stay in that job for only a couple of weeks?
> A:      Because I did not like it.
> Q:      What were the job duties?
> A:      It was like an assembly line atmosphere doing like wiring components for
>         automobiles.
> Q:      And you think you only worked there two weeks?
> A:      Yeah, it was just a couple of weeks.
> Q:      Did you voluntarily resign?
> A:      Yes.
> Q:      Did you give two weeks notice?
> A:      Probably not.

*Id*. at 95.  Ms. Kremhelmer also briefly discussed her employment with Express Services during

her deposition:

> Q:      Any other jobs that you've held that we haven't talked about already
>         today?
> A:      No, not that I can think of.  I might have done temp, like a temporary work
>         agency, or like a - - I've been to a place before where you just walk in in
>         the morning and if you're there early enough, they'll give you a job for the
>         day and you get paid that day.
> Q:      Okay.  Where was that?
> A:      It was up Grosbeck Highway I want to say, up near like Mount Clemens
>         area.
> Q:      Do you know when you worked there?
> A:      I was living in Clinton Township at the time. . .
>                 *****
> Q:      When did you live in Clinton Township?
> A:      I think I lived there - - I moved there in 2002.
> Q:      So it [her work with Express Services] would have been sometime in 2002
>         or later?
> A:      Right.

*Id*. at pp.95-96.  Again, despite specific instructions to list her employment history for at least the

prior seven years, and Ms. Kremhelmer's certification that her responses were complete and

accurate, Ms. Kremhelmer failed to disclose either the KDS Controls or the Express Services positions on her January 2001 application.

Notwithstanding these discrepancies - again, Ms. Wooten stated that resume screens and background checks would not typically be done for SSR applicants until after a hiring decision had been made - Location 31 invited Ms. Kremhelmer for an initial interview approximately one week after she submitted her application. *Id*. at 61-62. Upon arriving at Location 31, Ms. Kremhelmer was given an aptitude test, and she testified that the woman who administered this test did nothing to make Ms. Kremhelmer think she was being treated unfairly, nor did the woman discourage her from applying for an SSR position. *Id*. at 67.

Ms. Kremhelmer then had an interview with two male Cintas employees.[5] Again, as with the woman who administered her aptitude test, Ms. Kremhelmer did not feel that these interviewers treated her unfairly due to her gender. *Id*. at 63. Ms. Kremhelmer describes the interview as follows:

> Q:    Can you describe how the interview went?
> A:    It was just a normal interview. You know, they brought me in and asked me a few questions and told me about the job and that was it.
> Q:    Did they do anything to discourage you from applying for the job?
> A:    No.

*Id*. Ms. Kremhelmer left her January 2001 interview with Location 31 thinking that the interview went well, and felt good about her prospects for getting an SSR position. *Id*. at 154.

Ultimately, Ms. Kremhelmer was not advanced beyond the initial screening interview hiring phase. As she describes in her deposition, Ms. Kremhelmer received a letter from Cintas

---

[5] Cintas has no recollection as to the identities of these individuals who interviewed Ms. Kremhelmer in January of 2001.

informing her that the position was being filled by another applicant. In all, nothing about her experience applying for an SSR position gave Ms. Kremhelmer any reason to believe she was treated unfairly because of her gender:

Q:      . . . How did the interview conclude?
A:      They said that they had more interviews to do and they would get back to me.
Q:      And did they inform you that they were selecting a different candidate for the job?
A:      Yes.
Q:      At that point in time did you have any reason to believe that Cintas was choosing not to hire you because of your gender?
A:      No.
Q:      And until you received the letter from the EEOC, did you have any reason to believe that Cintas didn't hire you because of your gender?
A:      No.

*Id*. at 67-68.

Cintas argues that, about the same time Ms. Kremhelmer applied with Location 31 in January of 2001, two other more qualified applicants received SSR positions. Mr. Clayton Ross applied on January 9, 2001 - five days after Ms. Kremhelmer's application was submitted - and was hired on February 21, 2001. [Woonton Decl., Def.'s Ex. 7, Doc. No. 864, ¶¶12-13]. Unlike Ms. Kremhelmer, Mr. Ross had extensive customer service and sales experience - he had spent eleven years selling insurance and financial products for Primerica Financial Services. *Id*. Additionally, Mr. Ross had also served in the United States Coast Guard for six years prior to his application - a factor that Location 31 viewed favorably. *Id*.

Further, Mr. David Cunningham applied on January 9, 2001, and was hired by Location 31 on January 29, 2001. Like Mr. Ross - and unlike Ms. Kremhelmer - Mr. Cunningham had military experience - he served in the Marine Corps for approximately four years. *Id*. at ¶14.

Further, Mr. Cunningham also had route delivery experience through a newspaper delivery route, and sales and delivery experience as a pizza delivery driver. *Id*.

<u>Cintas' Instant Motion for Summary Judgment</u>

Following the close of discovery in this action, Cintas filed this motion for summary judgment [Doc. No. 864] on July 14, 2010. In this motion, Cintas argues that the EEOC's claims on behalf of Ms. Kremhelmer fail on their merits as a matter of law.[6] The EEOC opposes Cintas' motion. [Doc. No. 887]. The matter is now ripe for decision by the Court.

STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

---

[6] In addition to summary judgment motions attacking the merits of each of EEOC's thirteen individually-named plaintiffs, Cintas has also filed an omnibus motion attacking each of these named plaintiffs for procedural reasons - namely, the EEOC's failure to exhaust administrative remedies before filing this lawsuit. [*See* Doc. No. 836]. Notwithstanding the EEOC's arguments to the contrary [*see* EEOC's Br., Doc. No. 887, n1], the Court will address the merits of Ms. Kremhelmer's claim in this order, and will address the EEOC's alleged failure to exhaust administrative remedies on all named plaintiffs in a separate order.

ANALYSIS

In its instant motion [Doc. No. 864], Cintas argues that the EEOC's suit on behalf of Ms. Kremhelmer should be dismissed for two reasons: 1) because Ms. Kremhelmer was not "qualified" for an SSR position and therefore cannot advance a *prima facie* case of discrimination; and 2) because the EEOC cannot demonstrate that Cintas' decisions not to hire Ms. Kremhelmer was a pretext for gender discrimination. As the Court agrees with both of these arguments, dismissal of the EEOC's claim on behalf of Ms. Kremhelmer is therefore proper.

Section 706 permits the EEOC to sue a private employer on behalf of a "person or persons aggrieved" by an employer's unlawful employment practice. 42 U.S.C. § 2000e-5(f)(1). The EEOC is "master of its own case" when bringing suits on behalf of aggrieved persons in a § 706 lawsuit, and may bring such suits with or without the consent of the aggrieved persons. *EEOC v. Waffle House*, 534 U.S. 279, 291-92 (2002). "Nonetheless, it is axiomatic that the EEOC stands in the shoes of those aggrieved persons in the sense that it must prove all the elements of their [discrimination] claims to obtain individual relief for them." *EEOC v. CRST Van Expedited, Inc.*, 611 F.Supp.2d 918, 929 (N.D. Iowa 2009).

Absent evidence of intentional discrimination, the EEOC must pursue § 706 claims brought on behalf of aggrieved individuals under the familiar burden-shifting scheme outlined in *McDonnell-Douglas Corp. v. Green*, 422 U.S. 792 (1973). *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760 (4th Cir. 1998); *see also Serrano v. Cintas Corp.*, - - F.Supp.2d. - -, 2010 WL 522846 (E.D. Mich. Feb. 9, 2010). Under the *McDonnell-Douglas* framework, plaintiffs must first establish a *prima facie* case of discrimination. *McDonnell-Douglas*, 422 U.S. at 802. Once the plaintiff has established such a *prima facie* case, the burden of production shifts to the

employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. If the employer articulates such a legitimate, nondiscriminatory reason, the plaintiff bears the burden of proving that the employer's articulated reason is a pretext for discrimination. *Id*. The Court will consider each of these issues in turn.

    I. The EEOC's *Prima Facie* Case on Behalf of Ms. Kremhelmer.

To establish a *prima facie* case of discriminatory hiring practices, a plaintiff without direct evidence of discrimination must show that 1) she belonged to a protected class; 2) she applied and was qualified for a job for which the employer was seeking applicants; 3) despite her qualifications, she was rejected; and 4) after her rejection, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications. *See McDonnell-Douglas*, 411 U.S. at 802. In this case, Cintas only disputes the second of these requirements with respect to Ms. Kremhelmer's 2001 application with Location 31: that Ms. Kremhelmer was not "qualified" for an SSR position due to her failure to honestly set forth her prior employment history in her resume. The Court agrees.

In *Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003), the Sixth Circuit elaborated on the requirements of the "qualified" element of a *prima facie* discrimination claim. The *Wexler* Court held that, "[a]t the prima facie state, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler*, 317 F.3d at 575 (emphasis in original). To meet this burden, plaintiffs need only "present[] credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id*. at 576. The Sixth Circuit elaborates as follows:

Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrating possession of the required skills.

*Wexler*, 317 F.3d at 576.

In support of its argument that Ms. Kremhelmer was not "qualified" for a position with Location 31, Cintas argues as follows:

This litigation has revealed that Ms. Kremhelmer - even though she specifically certified that her application was complete - failed to include previous employers on. . . her application[]. . . This Court has already found that "basic honesty was an objective qualification for a position with Cintas" and that a claimant who "had lied on his employment application, even though the application stated several times in clear language that complete and accurate information was required . . . was thus not qualified for the job sought, and . . . failed to establish a *prima facie* case of discrimination." Ms. Kremhelmer failed to demonstrate basic honesty on her application.

[Def.'s Br., Doc. No. 864, pp.16-17, citing Doc. No. 511, p.4 (internal citations and quotations omitted)]. The Court agrees. While the EEOC generally argues that fact questions remain regarding Ms. Kremhelmer's honesty in completing the 2001 application with Location 31 [*see* EEOC's Br., Doc. No. 887, pp.14-15], this Court has already determined basic honesty to be an objective requirement of SSR applicants. [*See* Doc. No. 511, p.4]. The EEOC's brief does not explain Ms. Kremhelmer's misrepresentations in regards to her prior employment history on the January 2001 application.

On the facts presented, the Court finds Ms. Kremhelmer not "qualified" for an SSR position for purposes of prong one of the *McDonnell-Douglas* inquiry, and the EEOC's arguments to the contrary are without merit. However, the Court will nonetheless move on to consider the second prong of the *McDonnell-Douglas* inquiry - Cintas' legitimate, nondiscriminatory rationale for not hiring Ms. Kremhelmer.

16

II. <u>Cintas' Legitimate, Nondiscriminatory Rationale for Not Hiring Ms. Kremhelmer</u>.

In its motion for summary judgment, Cintas argues that it has pointed to legitimate, nondiscriminatory reasons for why it did not hire Ms. Kremhelmer:

> Even if the EEOC could make a *prima facie* showing of discrimination, Cintas has pointed to multiple legitimate, non-discriminatory reasons for why it did not hire Ms. Kremhelmer.  When she applied in 2001 to Location 31, she lacked customer service or sales experience. . . Moreover. . . more qualified candidates - with more relevant experience - were interviewed and hired.

[Def.'s Br., Doc. No. 864, p.17 (internal citations omitted)].

In its brief in opposition to Cintas' motion [Doc. No. 887], the EEOC argues as follows:

> In the instant case, Cintas has stated that no manager or employee at location 31 has testified that he or she recalls Kremhelmer, her application or any interview with her.  Defendant thus cannot offer any nondiscriminatory reason as to why Kremhelmer was not hired.

[EEOC's Br., Doc. No. 887, p.16 (internal citation omitted)].  This argument, however, is unavailing.  On the facts of this case, there is nothing wrong with Cintas's proffered argument advancing reasons why *it would not have hired Ms. Kremhelmer*.  The EEOC offers no authority for its proposition that employers cannot offer rationales for why they would not have hired an applicant when no manager specifically remembers interviewing the candidate.

For purposes of this motion, therefore, the Court holds that Cintas' proffered rationales for not hiring Ms. Kremhelmer are legitimate and nondiscriminatory, and the EEOC's arguments to the contrary are without merit.  Thus, the Court will consider the third and final prong of the *McDonnell-Douglas* inquiry - the EEOC's ability to demonstrate that Cintas' rationales for not hiring Ms. Kremhelmer were a pretext for gender discrimination.

III.  <u>The EEOC's Case for Pretext</u>.

Cintas argues that the EEOC is unable to demonstrate that Cintas' asserted reason for not

hiring Ms. Kremhelmer is pretextual.  [Def.'s Br., Doc. No. 864, p.18].  The Court agrees, and

therefore **GRANTS** Cintas' motion for summary judgment [Doc. No. 864].

The Sixth Circuit has held that pretext can be shown:

> . . . in three interrelated ways: (1) that the proffered reasons had no basis in fact,
> (2) that the proffered reasons did not actually motivate the employer's action, or
> (3) that they were insufficient to motivate the employer's decision.

*Chen v. Dow Chemical Corp.*, 580 F.3d 394, 400 (6th Cir. 2009), citing *Hedrick v. W. Reserve*

*Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004).  To carry its burden in opposing summary

judgment, the EEOC must produce sufficient evidence from which a jury could reasonably reject

Cintas' explanation of why it chose not to hire Ms. Kremhelmer.  *Id*.  Further, it is not sufficient

for the EEOC to simply allege fact questions regarding the pretextual nature of Cintas' actions.

"A defendant's proffered reason cannot be proved to be a pretext 'unless it is shown *both* that the

reason was false *and* that discrimination was the real reason.'"  *Harris v. Metro. Gov't of*

*Nashville and Davidson County, Tennessee*, 594 F.3d 476, 486 (6th Cir. 2010), citing *St. Mary's*

*Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (quotations and emphasis in original).

The EEOC relies primarily upon statistical and anecdotal evidence of discrimination in an

attempt to rebut as pretextual Cintas' decision not to hire Ms. Kremhelmer.  Relevant to this

case, the EEOC argues that when a plaintiff offers:

> . . . other probative evidence of discrimination, that evidence, taken together with
> the evidence that the plaintiff was as qualified as or better qualified than the
> successful applicant, might well result in the plaintiff's claim surviving summary
> judgment.

[EEOC's Br., Doc. No. 887, p16, quoting *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 392 (6th Cir. 2009), citing *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 626-27 (6th Cir. 2006)].

Here, the EEOC generally argues that Ms. Kremhelmer's qualifications for an SSR position with Location 31 were better than those of Mr. Ross or Mr. Cunningham. [EEOC's Br., Doc. No. 894, pp.17-18]. This evidence, coupled with the statistical evidence proffered, the EEOC argues, is sufficient to rebut Cintas' rationale as pretextual. *Id*. The Court disagrees.

In *Risch*, the Sixth Circuit considered the claims of a female police officer who was allegedly passed over for a detective position with her police department because she was a woman. *Risch*, 581 F.3d at 385. The police department passed over her "in favor of two male applicants who had lower scores than Risch under the promotion system used by the Department." *Id*. The "other probative evidence" relied upon in *Risch* was explained as follows:

> The record also contains other evidence probative of pretext. The record indicates that male officers frequently made degrading comments regarding the capabilities of female officers, expressed the view that female officers would never be promoted to command positions, and made generally degrading remarks about women.

*Risch*, 581 F.3d at 392. These statements, the Sixth Circuit held, "evidence a discriminatory atmosphere in the Department in which male officers frequently made derogatory or discriminatory remarks about female officers." *Id*. at 393. Thus, the Sixth Circuit held, the plaintiff in *Risch* had presented enough evidence to survive summary judgment:

> In light of the above evidence of a discriminatory atmosphere in the Department, the lack of women in command positions at the Department, and the evidence that Risch was arguably better qualified than the two male applicants promoted in 2005, we conclude that Risch has produced sufficient evidence to establish a genuine issue of material fact concerning whether the Department's proffered legitimate, nondiscriminatory reason was pretextual.

19

*Id.* at 394.

Here, by contrast, the EEOC's "other evidence" is limited to the statistical analysis of Dr. Thomas DiPrete. [*See* EEOC's Ex. BB, Doc. No. 901]. In his expert report, Dr. DiPrete examined all SSR hirings at Cintas locations in Michigan from 1999 to 2005, and found that, of the 427 SSR hirings in the state of Michigan during that time, only 24 - or approximately 5.6% - were female. [*See* DiPrete Report, EEOC's Ex. BB, Doc. No. 901, p.5; EEOC's Br., Doc. No. 887, p.2]. Based on Dr. DiPrete's analysis, the EEOC goes on to argue as follows:

> Comparing female hires with different estimates of female availability, Dr. DiPrete noted a pattern of underhiring that was statistically significant beyond the threshold of two standard deviations. That is, it is highly unlikely that the pattern of underhiring females at Cintas occurred by chance alone.

[EEOC's Br., Doc. No. 887, p.3]. The Court, however, disagrees.

In *Bowdish v. Continental Accessories, Inc.*, 1992 WL 133022 (6th Cir. June 12, 1992), the Sixth Circuit rejected that plaintiff's attempts to use anecdotal evidence as evidence of discriminatory pretext. The *Bowdish* Court held that anecdotal or statistical evidence, on its own, is insufficient to establish pretext:

> . . . such evidence, standing alone, still would not be sufficient to establish a case of individual disparate treatment. An individual plaintiff in an employment discrimination case must present some evidence that demonstrates that his or her individual discharge was the result of discrimination.

*Bowdish*, 1992 WL 133022, *5. Therefore, the EEOC's attempt in this litigation to demonstrate the pretextual nature of Cintas' failure to hire Ms. Kremhelmer by statistical or anecdotal evidence is insufficient. Dr. DiPrete admitted as much at his deposition, when he stated that he could not express any opinion in regards to why any individual named plaintiff may not have been hired. [*See* DiPrete Dep., Def.'s Ex. 3, Doc. No. 911, pp.67-69, 136-37].

Further, the EEOC's attempt to bootstrap a pretext finding based upon cobbled-together anecdotes from individuals commenting on other locations and times than Ms. Kremhelmer's applications to Location 31, from statistics relating to the purported hiring patterns of other Cintas locations, and from the concurrently-filed cases of the other twelve named plaintiffs in this matter, each also fail to demonstrate pretext in this matter. "Other location" and "other time" hiring decisions are irrelevant to the question of whether Location 31 refused to hire Ms. Kremhelmer because of her gender. *See, e.g., Davis v. Hammonds*, 103 Fed. Appx. 51, 53 (8th Cir. 2004); *Shaw v. Monroe County*, 1996 WL 426483 (E.D. Mich. Apr. 18, 1996).

Finally, even if statistics alone *could* warrant consideration as evidence of pretext in this matter, the EEOC's statistics are merely "statistics without correlation," which "are indicative of no meaningful inference or conclusion." *Shaw*, 1996 WL 426483, *8, quoting *Long v. City of Saginaw*, 911 F.2d 1192, 1201 (6th Cir. 1990). In *Long*, the Sixth Circuit rejected statistics which purported to show the availability of minority candidates for the Saginaw Police Department. In that case, the "available labor pool" used to calculate the statistics was held to be *too broad in scope*, because it included all individuals identified as working in "protective services" by the U.S. Census Bureau - a classification that included "bouncers, camp guards, school-crossing guards, meter maids. . . life guards, dog catchers, [and] bodyguards[,]" to name but a few examples. *Long*, 911 F.2d at 1200.

Here, by contrast, the EEOC's statistical analysis by Dr. DiPrete is even broader than the available labor pool utilized in *Long* - it includes census labor groupings such as human resource managers, computer support specialists, clergy, elementary and middle school teachers, artists, cooks, counter attendants and convenience store clerks, receptionists, and office clerks within its

calculations of the available labor pool. While the EEOC vigorously disputes the propriety of basing the available labor pool for SSR positions on a single census occupation code - 913, relating to driver/sales workers and truck drivers [*see* Doc. No. 833, pp.12-17] - *clearly* the EEOC's own statistics draw from far too broad an available labor pool - and thus overly inflate female availability for SSR positions. For these reasons, the EEOC has not proffered the type of "other probative evidence" discussed in *Risch* as sufficient to survive summary judgment.

Again, save for the EEOC's statistical evidence proffered by Dr. DiPrete, the EEOC's sole evidence to demonstrate pretext on behalf of Ms. Kremhelmer is limited to the argument that she was more qualified than other individuals who received interviews - and, ultimately, were hired as SSRs - at Location 31. [*See* Def.'s Br., Doc. No. 887, pp. 17-18]. While potentially true, the Court disagrees with the EEOC's overall argument. As the Sixth Circuit commented in *Bender v. Hecht's Dept. Stores*, 455 F.3d 612 (6th Cir. 2006):

> Of course, acknowledging that evidence of comparative qualifications may be probative of pretext is a far cry from holding that such evidence is itself sufficient in all cases to raise a genuine issue of fact of discriminatory motive. For we need to balance the Supreme Court's statement in *Burdine* [that qualifications evidence may be probative of whether the employer's reasons are pretexts for discrimination] with the principles that employers are generally free to choose among qualified candidates, and that the law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. . . a rejected applicant must show that a reasonable jury could conclude that the actual reasons offered by the defendant were a mere pretext for unlawful []discrimination, not that other reasonable decision-makers might have retained the plaintiff.

*Bender*, 455 F.3d at 626 (internal citations and quotations omitted). The *Bender* Court went on to hold as follows:

> On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's

qualifications must be *so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former*.  In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of material fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

*Bender*, 455 F.3d at 627 (emphasis added).

The EEOC has failed to demonstrate that Ms. Kremhelmer's qualifications were "so significantly better" than those of any applicant hired instead of her that "no reasonable employer would have chosen the latter applicant[s] over the former." *Bender*, 455 F.3d at 627.  True, when viewed in the light most favorable to the EEOC's claims on behalf of Ms. Kremhelmer, perhaps many of the elements of her relevant experience would have looked more favorable than those of other applicants.[7]  But to allow these type of side-by-side comparisons of Ms. Kremhelmer's qualifications to those of successful applicants - absent other probative evidence of discrimination - would, in the words of the *Bender* Court:

. . . move this court from its proper role of preventing unlawful employment practices to the illegitimate role of acting as a "super personnel department," overseeing and second-guessing employers' business decisions.

*Bender*, 455 F.3d at 628, quoting *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983).

Even assuming that the EEOC could show that Cintas' purportedly legitimate, nondiscriminatory reason for not hiring Ms. Kremhelmer was pretextual, the EEOC has failed to offer any evidence raising a genuine issue of material fact that this reason was a pretext for gender discrimination.  This evidentiary failure is fatal to the EEOC's claim on behalf of Ms.

---

[7] The EEOC makes no specific argument in its brief [Doc. No. 887] that Ms. Kremhelmer was better qualified than Mr. Ross - the entirety of its argument centers around. Mr. Cunningham.

Kremhelmer in this litigation, and summary judgment in Cintas' favor is therefore proper. The EEOC's arguments to the contrary are without merit.

CONCLUSION

For the reasons explained above, the Court **GRANTS** Cintas' motion for summary judgment [Doc. No. 864], and **DISMISSES WITH PREJUDICE** the EEOC's claim brought on behalf of Ms. Kremhelmer.

**IT IS SO ORDERED.**


s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: September 9, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 9, 2010, by electronic and/or ordinary mail.

s/Jennifer Hernandez
Case Manager